**WAYNE COUNTY, Tennessee,
Respondent–Appellant,**

v.

**The TENNESSEE SOLID WASTE DISPOSAL CONTROL BOARD,
Respondent–Appellee,**

v.

**Margaret GALLAHER,
Intervenor–Respondent–Appellant.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

May 27, 1988.

Charles Jeffrey Barnett, Waynesboro, Richard Lodge, Bass, Berry & Sims, Nashville, for respondent-appellant.

W.J. Michael Cody, Atty. Gen. and Reporter, Frank J. Scanlon, Deputy Atty. Gen., Donna J. Smith, Asst. Atty. Gen., for respondent-appellee.

Gary A. Davis, Knoxville, for intervenor-respondent-appellant.

## OPINION

KOCH, Judge.

This appeal arises from a dispute concerning whether the Wayne County landfill is contributing to the contamination of two wells belonging to a neighboring landowner. The Tennessee Solid Waste Disposal Control Board, finding that the landfill was a nuisance and that it contributed to the contamination, directed the County to close the landfill properly and to provide the neighboring landowner with a permanent, uncontaminated supply of water. The County filed a petition for review in the Chancery Court for Davidson County. The trial court found that there was substantial and material evidence to support the Board's finding that the landfill caused the contamination of its neighbor's well water. It also held that the Board exceeded its authority by ordering the County to supply the landowner with uncontaminated water. Both the County and the landowner have appealed. We affirm the decision of the trial court.

## I.

Margaret Gallaher and her husband, Marion, live on a farm in Hardin Hollow near Waynesboro. Mr. Gallaher was born and raised on the property, and the couple has lived there since 1937 along with two of Mr. Gallaher's brothers. The farm house is located near a stream called Banjo Branch, which is fed by springs located further up in Hardin Hollow.

The Gallahers drilled a well in 1955 to supply their house with fresh water. In 1976, they drilled a second well, for their son's use, approximately one half mile further down Hardin Hollow. This well was operated only briefly and was capped off in 1976.

In August, 1976, Wayne County built a solid waste landfill at the head of Hardin Hollow despite objections by the Gallahers and other landowners in the area. The landfill is located on a ridge almost two miles from the Gallahers' house. The ridge is on a higher elevation, and its steeply sloping sides allow the rapid drainage of surface water into the neighboring valleys including Hardin Hollow.

The County experienced problems operating the landfill during the eight years it was open. A former employee of the Division of Solid Waste Management ("Division") who testified for the Gallahers described the landfill as "not much more than a glorified dump" and stated that the County's operation of the landfill was "very poor".

The landfill caused siltation problems in Banjo Branch as early as 1977. Leachate [1] began to ooze from the landfill in 1981. In April, 1982, the Division issued a formal order of non-compliance stating that "[a]ll inspections for at least the last five months show three major recurring problems: (1) unsatisfactory cover, (2) leachate, and (3) flies." The County was unable to rectify the leachate problem while the landfill was in operation. It reappeared in 1983 and continued after February, 1984, when the landfill closed because it was full. In November, 1984, the Division approved the final closure of the landfill but warned the County that the potential for erosion and leaching still existed and that additional maintenance would be required to correct these problems.

Mrs. Gallaher stated that her well water and the water in Banjo Branch had been good until the landfill was constructed. After that time, one of the springs feeding the stream became cloudy and algae began to grow on the rocks in the stream near her

---

1. Leachate was described by one of the Gallahers' expert witnesses as "a black noxious liquid substance with an oily rainbow sheen upon its surface." It is caused by improperly covering the waste in a landfill thereby allowing surface water to penetrate the landfill and mix with the waste.

house.[2] In 1980 she began to notice a gradual change in the quality of her water. Her dishwasher and plumbing became corroded and clogged. Her bathroom became "all splotched up," her washing machine "turned red inside," and her dishes "were discolored and smokish." She also noted that the water had a odor like "sulphur or gas or acid or something."

Mrs. Gallaher and those living with her stopped using the water from the well in 1981 after one of her husband's brothers became ill. They started hauling water from a nearby school for all their cooking, drinking and bathing.

Mrs. Gallaher had the water tested in 1983. The Division informed her that her water exceeded the EPA recommended limits for hardness, iron, and sulfates but that these limits related mainly to "acceptable esthetic and taste characteristics." The Division also informed Mrs. Gallaher that it "appeared to be good other than the excess levels of hardness" and that "there does not appear to be any reason to suspect the Wayne County Landfill of contaminating your well."

Relying on this information, Mrs. Gallagher replaced the old plumbing and connected it to the well one half mile away that had not been used since 1976. The water appeared to be good at first. It was clear, but particles appeared when it was allowed to settle. Mr. Gallaher's brother became ill again, and Mrs. Gallaher's skin began to itch and burn when she bathed. After approximately three weeks, the water from the new well was as bad or worse than the water from the old well. The Gallahers stopped using it and went back to hauling water from the school.

The Division tested the water from Mrs. Gallaher's old well in early 1984 and found it to be "very cloudy with rust colored particles." Additional water samples were taken later in 1984 and early 1985 to verify the oil and grease analysis that had already been performed. The chemistry professor who tested these samples stated that an oil film could be seen on the top of the samples and that they smelled "rather like the grease pit at ... a service station."

The Gallahers complained to the Division in June, 1984 about the effect the landfill was having on their water. After the Division ceased its enforcement activities against the County in November, 1984, the Gallahers filed a complaint with the Tennessee Solid Waste Disposal Control Board ("Board"), requesting that the landfill be monitored more closely and that the County be ordered to provide them with uncontaminated water.

The Board conducted a hearing in April and May, 1985 and issued a Final Decision and Order finding that "[b]ased on the weight of the evidence, it is more likely than not that leachate from the Wayne County landfill is contributing to the contamination of the groundwater supplying the two Gallaher wells." The Board determined that the landfill constituted a nuisance and was violating Rule 1200–1–7–.06(3)(a)16 (Revised 1977)[3]. It directed the County to close the landfill in a manner satisfactory to the Division and to supply the Gallahers with a safe, uncontaminated drinking water supply.

The County filed a petition to review the Board's decision in the Chancery Court for

2. The presence of algae in Banjo Branch indicated the presence of "organic enrichment" in the stream that was not an expected natural phenomenon.

3. Tenn.Admin.Comp. ch. 1200–1–7–.06(3)(a)16 provides:

Contamination Control—There shall be no contamination of ground or surface water resulting from deposits of solid wastes or their products of decomposition, nor hazard or nuisance caused by gases or other products generated by the biologically or chemically active waste. Should any liquids or gases which might contaminate ground or surface water or create a hazard or nuisance be released from the registered sanitary landfill, then those measures necessary to eliminate the contamination or nuisance, shall be initiated immediately by the registrant. All gases or liquid waste discharges shall comply with the existing "Water Quality Control Act of 1971" (T.C.A. 70–324, et seq.), and the provisions of "Tennessee Air Quality Control Act" (T.C.A. 53–3408 et seq.). Prior approval should be received from the Department before initiating control procedures which require authorization of the approved operating plant.

Davidson County. The trial court found that there was substantial and material evidence to support the Board's findings that the landfill was a nuisance and that it was contributing to the contamination of the Gallahers' water supply. However, while holding that the Board had the authority to direct the County to clean up the contamination caused by the landfill, the trial court determined that the Board did not have the authority to order "the provision of a water supply to a third party whose water is contaminated as a result of violations" of the water quality standards.

## II.

The County asserts that the Board's decision was arbitrary and capricious because it "is not supported by any evidence directly demonstrating a causal connection" between the landfill and the contamination in the Gallahers' wells. It's formulation of the issue suggests a broader scope of review of the Board's factual determinations than that required by Tenn.Code Ann. § 4–5–322(h)(5) (Supp.1987).[4] Using the Uniform Administrative Procedures Act's standard for reviewing factual determinations, we have determined that there is substantial and material evidence to support the Board's findings of fact.

## A.

■ Courts defer to the decisions of administrative agencies when they are acting within their area of specialized knowledge, experience, and expertise. *Southern Ry. v. State Bd. of Equalization,* 682 S.W.2d 196, 199 (Tenn.1984); *Freels v. Northrup,* 678 S.W.2d 55, 57–58 (Tenn.1984); *Illinois Cent. Gulf R.R. v. Tennessee Pub. Serv. Comm'n,* 736 S.W.2d 112, 117 (Tenn.Ct. App.1987); *Griffin v. State,* 595 S.W.2d 96, 99 (Tenn.Crim.App.1980). Accordingly, judicial review of an agency's action follows

the narrow, statutorily defined standard contained in Tenn.Code Ann. 4–5–322(h) rather than the broad standard of review used in other civil appeals. *CF Indus. v. Tennessee Pub. Serv. Comm'n,* 599 S.W.2d 536, 540 (Tenn.1980); *Metropolitan Gov't of Nashville v. Shacklett,* 554 S.W.2d 601, 604 (Tenn.1977); *DePriest v. Puett,* 669 S.W.2d 669, 673 (Tenn.Ct.App.), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 505, 83 L.Ed.2d 397 *reh. denied,* 469 U.S. 1181, 105 S.Ct. 942, 83 L.Ed.2d 954 (1985).

■ The narrower scope of review used to review an agency's factual determinations suggests that, unlike other civil appeals, the courts should be less confident that their judgment is preferable to that of the agency. *See* 2 C. Koch, *Administrative Law and Practice* § 9.4 (1985). Courts do not review the fact issues de novo and, therefore, do not substitute their judgement for that of the agency as to the weight of the evidence, *Humana of Tennessee v. Tennessee Health Facilities Comm'n,* 551 S.W.2d 664, 667 (Tenn.1977); *Grubb v. Tennessee Civil Serv. Comm'n,* 731 S.W.2d 919, 922 (Tenn.Ct.App.1987), even when the evidence could support a different result. *Hughes v. Board of Comm'rs,* 204 Tenn. 298, 305, 319 S.W.2d 481, 484 (1958).

■ Tenn.Code Ann. § 4–5–322(h)(5) directs the courts to review an agency's factual determinations to determine whether they are supported by "evidence which is both substantial and material in light of the entire record." An agency's factual determination should be upheld if there exists "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Southern Ry. v. State Bd. of Equalization,* 682 S.W.2d 196, 199 (Tenn.

---

4. This section states, in part:
   (h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

       \*   \*   \*   \*   \*   \*

    (5) Unsupported by evidence which is both substantial and material in light of the entire record. In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment [sic] for that of the agency as to the weight of the evidence on questions of fact.

1984); *Sweet v. State Technical Inst.*, 617 S.W.2d 158, 161 (Tenn.Ct.App.1981).

■ The "substantial and material evidence" standard contained in Tenn.Code Ann. § 4–5–322(h)(5) is couched in very broad language. What amounts to substantial evidence is not precisely defined by the statute. In general terms, it requires something less than a preponderance of the evidence, *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), but more than a scintilla or glimmer. *Pace v. Garbage Disposal Dist.*, 54 Tenn.App. 263, 267, 390 S.W.2d 461, 463 (1965).

■ Substantial evidence is not limited to direct evidence but may also include circumstantial evidence or the inferences reasonably drawn from direct evidence. *Radio Officers Union v. NLRB*, 347 U.S. 17, 49, 74 S.Ct. 323, 340, 98 L.Ed. 455 (1954); *City of Pompano Beach v. FAA*, 774 F.2d 1529, 1540 (11th Cir.1985); *Carter–Wallace, Inc. v. Gardner*, 417 F.2d 1086, 1093 (4th Cir.1969), *cert. denied*, 398 U.S. 938, 90 S.Ct. 1842, 26 L.Ed.2d 271 (1970); *Lackawanna Refuse Removal, Inc. v. Commonwealth, Dep't of Envt'l Resources*, 65 Pa.Commw. 372, 442 A.2d 423, 425 (1982); *Board of Firemen's Relief & Retirement Fund Trustees of Houston v. Marks*, 150 Tex. 433, 242 S.W.2d 181, 185 (1951).

■ The general rules governing judicial review of an agency's factual decisions apply with even greater force when the issues require scientific or technical proof. Appellate courts have neither the expertise nor the resources to evaluate complex scientific issues de novo. *See Thompson Medical Co. v. FTC*, 791 F.2d 189, 196 (D.C.Cir.1986), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). When very technical areas of expertise are involved, they generally defer to agency decisions, *Story v. Marsh*, 732 F.2d 1375, 1381 (8th Cir.1984); *Petrou Fisheries, Inc. v. ICC*, 727 F.2d 542, 545 (5th Cir.1984), and will not substitute their judgment for that of the agency on highly technical matters. *Community Nutrition Inst. v. Young*, 773 F.2d 1356, 1363 (D.C.Cir.1985), *cert. de-*

*nied,* 475 U.S. 1123, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986).

■ However, the court's deference to an agency's expertise is no excuse for judicial inertia. *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). Even in cases involving scientific or technical evidence, the "substantial and material evidence standard" in Tenn.Code Ann. § 4–5–322(h)(5) requires a searching and careful inquiry that subjects the agency's decision to close scrutiny. *See Crounse Corp. v. ICC*, 781 F.2d 1176, 1187 (6th Cir.), *cert. denied*, 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986); *Cranston v. Clark*, 767 F.2d 1319, 1321 (9th Cir.1985).

## B.

■ The Board found that the landfill had been poorly operated and improperly closed and that the manner of its operation and closing had caused the formation of leachate. It also determined that the leachate "more likely than not" contributed to the contamination of the ground water supplying the Gallaher's wells and that the contamination "will likely continue" until the landfill is closed properly. Like the trial court, we have determined that there is substantial and material evidence to support these factual determinations.

The evidence is largely undisputed that the landfill was improperly operated, thereby causing leachate to form. The County received numerous citations from the Division during the life of the landfill noting that the waste was being covered improperly, and that leachate was forming and entering the water course. The Division repeatedly ordered the County to correct the problem, and while the County attempted to do so, it was never completely successful. The problem continued after the landfill was closed. Even when the Division discontinued its enforcement action against the County, it warned that the potential for erosion and leaching continued to exist and that additional maintenance would be required. There is no evidence in the record

indicating that the County has acted to control or prevent the risk of further erosion and leaching.

There is also substantive evidence that the Gallahers' wells are contaminated and that the source of contamination is the landfill. Mrs. Gallaher's testimony that the quality of her water did not deteriorate until after the landfill had been in operation for several years was unchallenged. The poor quality of the water was demonstrated by testimony describing its appearance, smell and taste, the illness of Mrs. Gallaher's brother-in-law, the burning sensation when she showered, and the effect of the water on her plumbing and appliances. It was also corroborated by proof that the water contained substances, not in naturally occurring quantities, that were also present in the landfill and the leachate.

The County never disputed that the quality of Mrs. Gallaher's water was poor. It insisted, however, that the condition of the water was due to naturally occurring phenomena, not the landfill. To support its position, it presented expert proof that it was geologically "inconceivable" that leachate from the landfill was flowing into the aquifer from which the Gallahers' water comes. However, the Gallahers presented expert geologic proof to the contrary.

■ Agencies are not bound by the expert opinions presented to them. *Dayton Power & Light Co. v. Public Utils. Comm'n*, 292 U.S. 290, 299, 54 S.Ct. 647, 652, 78 L.Ed. 1267 (1934). Because of their presumed expertise and knowledge, agencies are accorded

> wide discretion in determining the weight or probative value to be given the testimony of the expert witness. This is not to say that an agency may arbitrarily dismiss the opinion of an expert and substitute its own unsubstantiated opinion.... The duty of the agency with regard to crediting or discounting expert evidence is to actually consider the expert's opinion in reaching a final decision.

4 J. Stein, G. Mitchell & B. Mezines, *Administrative Law* § 28.03, at 28–13—28–16 (1988).

■ Resolving conflicting evidence is for the agency. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Idaho State Ins. Fund v. Hunnicutt*, 110 Idaho 257, 715 P.2d 927, 930–31 (1985); *Southern Worcester County Regional Vocational School Dist. v. Labor Relations Comm'n*, 386 Mass. 414, 436 N.E.2d 380, 384 (1982); *Firemen's and Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex.1984). Thus, when conflicts in expert testimony arise, it is the agency's prerogative to resolve them, not the court's. *Webb v. Gorsuch*, 699 F.2d 157, 160 (4th Cir.1983).

We have reviewed the expert testimony offered by both parties and have determined that it is not so lacking in substance that it should not have been considered and given determinative weight. Therefore, the Board was justified in resolving the conflicting expert testimony in favor of the Gallahers and in basing its findings upon the Gallahers' proof. Based on the entire record, and taking into consideration the proof that fairly detracts from evidence relied upon by the Board, we have determined that the evidence and the inferences drawn from the evidence provide a reasonably sound basis for the Board's action.

### III.

The County also insists that the Board exceeded its authority by ordering it to provide the Gallahers with a permanent supply of uncontaminated water.[5] The trial court agreed. While the Tennessee Solid Waste Disposal Act ("Act") gives the Board broad authority to take steps to abate acts causing a nuisance to the public in general, we concur with the trial court's determination that the Board does not have the statutory authority to fashion remedies in essentially private nuisance actions. This relief must be found in the courts.

---

**5.** Tenn.Code Ann. § 4–5–322(h)(2) (Supp.1987) provides that the reviewing court may reverse

or modify an agency's decision if it is "[i]n excess of the statutory authority of the agency."

## A.

Administrative agencies derive their authority from the General Assembly. Thus, their power must be based expressly upon a statutory grant of authority or must arise therefrom by necessary implication. *Tennessee Pub. Serv. Comm'n v. Southern Ry.*, 554 S.W.2d 612, 613 (Tenn. 1977); *General Portland, Inc. v. Chattanooga–Hamilton County Air Pollution Control Bd.*, 560 S.W.2d 910, 913 (Tenn.Ct. App.1976). Even though statutes like the Act should be construed liberally because they are remedial, *Big Fork Mining Co. v. Tennessee Water Quality Control Bd.*, 620 S.W.2d 515, 519–20 (Tenn.Ct.App.1981), the authority they vest in an administrative agency must have its source in the language of the statutes themselves. *Williams v. American Plan Corp.*, 216 Tenn. 435, 443, 392 S.W.2d 920, 924 (1965); *Madison Loan & Thrift Co. v. Neff*, 648 S.W.2d 655, 657 (Tenn.Ct.App.1982).

The courts should give the language of a statute its natural and ordinary meaning in light of the substance of the entire statute. *Oliver v. King*, 612 S.W.2d 152, 153 (Tenn.1981). Statutes forming a single statutory scheme should be construed together to make the system consistent in all its parts and uniform in its operation. *Westinghouse Electric Corp. v. King*, 678 S.W.2d 19, 23 (Tenn.1984), *app. dismissed*, 470 U.S. 1075, 105 S.Ct. 1830, 85 L.Ed.2d 131 (1985); *Pritchard v. Carter County Motor Co.*, 197 Tenn. 222, 224, 270 S.W.2d 642, 643 (1954); *Bodin Apparel, Inc. v. Lowe*, 614 S.W.2d 571, 573 (Tenn.Ct. App.1980).

## B.

The Act was passed in 1969 to "protect the public health, safety and welfare, prevent the spread of disease and creation of nuisances, conserve our natural resources, enhance the beauty and quality of our environment and provide a coordinated statewide solid waste disposal program." Tenn. Code Ann. § 68–31–102 (1987). As part of this program, Tenn.Code Ann.

§ 68–31–104(3) (1987) provides that it is unlawful to "[c]onstruct, alter, or operate a solid waste processing or disposal facility or site in violation of the rules, regulations, or orders of the commissioner or in such a manner as to create a public nuisance."

The authority for implementing the Act and for enforcing its provisions rests with the Commissioner of Health and Environment ("Commissioner") and the Board. While there has been some legislative indecision concerning their respective powers,[6] the Commissioner presently has the authority to investigate and supervise the construction, alteration, and operation of solid waste disposal facilities and sites. Tenn. Code Ann. §§ 68–31–105(a) & 107(a) (1987). The Board has the authority to promulgate and enforce regulations pertaining to the same activities. Tenn.Code Ann. §§ 68–31–105(c), 107, § 111(d) & (f) (1987). The Board's enforcement power is independent from the Commissioner's, and in some circumstances not applicable to this case, the Board has the authority to review and modify the Commissioner's enforcement actions. Tenn.Code Ann. §§ 68–31–111(f) & 113(a)–(f).

In its original form, the Act's enforcement mechanisms could be triggered only by the Commissioner or the Board. In 1980, Tenn.Code Ann. § 68–31–113(h) was enacted, enabling private parties to file complaints with the Commissioner regarding violations of the Act. This amendment also provided for an appeal to the Board if either party was dissatisfied with the Commissioner's response to the complaint. While Tenn.Code Ann. § 68–31–113(h) does not specifically describe the enforcement remedies available to the Board when private parties file complaints, it is reasonable to infer that the Board's remedial authority is at least as broad as the Commissioner's.

The Act gives the Commissioner six enforcement options, all intended to abate or avoid injuries to the public that could be caused by violations of the Act. The Commissioner may: (1) revoke or deny applica-

---

**6.** *Compare* Act of May 1, 1980, ch. 899, § 7, 1980 Tenn.Pub.Acts 1334, 1342 *with* Act of May 16, 1985, ch. 337, §§ 1, 2, 4, 5, & 6, 1985 Tenn.Pub. Acts 646, 646–47.

tions for registration under Tenn.Code Ann. § 68–31–106(d) (1987); (2) disapprove applications for loans or grants under Tenn.Code Ann. § 68–31–109 (1987); (3) issue orders of correction in accordance with Tenn.Code Ann. § 68–31–112 (1987); (4) refer the case for criminal prosecution under Tenn.Code Ann. § 68–31–114 (1987); (5) institute proceedings seeking injunctive relief pursuant to Tenn.Code Ann. § 68–31–115 (1987); and assess civil penalties under Tenn.Code Ann. § 68–31–117 (1987).

In addition to the Commissioner's powers, the Board has the authority to review any order of correction issued by the Commissioner and, when doing so, to "make findings and enter such orders as in its opinion will best further the purposes of this [Act]." Tenn.Code Ann. § 68–31–113(f) (1987). The Board also has the authority, pursuant to Tenn.Code Ann. § 68–31–113(h), to review the Commissioner's response to private complaints. In these situations, the Board's authority extends to the six enforcement options available to the Commissioner.

■■■ The Act's remedies are designed to protect the public health and to conserve and enhance the environment. When violations occur, the Act gives the regulators broad authority to stop the violation and to order steps to remedy or mitigate its effects. The Act does not explicitly provide a private right of action for persons who have been damaged as a result of a violation. Nor does it explicitly empower the Commissioner or the Board to grant or seek legal or equitable relief on behalf of those who have been damaged.

The Board claims that it has the authority to fashion remedies for essentially private wrongs even though the Act does not give it explicit authority to do so. Asserting that the authority is implicit in its authority to abate public nuisances and to issue orders of correction, the Board argues that its interpretation of the Act is reasonable and consistent with the Act's purposes.

Notwithstanding the logic and appeal of the Board's position, it provides an insufficient basis for this Court to engraft reme-dies onto the Act that were not put there by the General Assembly. It is not our role to determine whether a party's suggested interpretation of a statute is reasonable or good public policy or whether it is consistent with the General Assembly's purpose. We must limit our consideration to whether the power exercised by the Board is authorized by the express words of the statute or by necessary implication therefrom.

We have determined that nothing in the Act expressly gives the Board or the Commissioner the authority to grant remedial relief to private parties. The Commissioner's and the Board's authority to provide relief for injuries to the general interests of the public will not be diminished by their inability to provide private remedies. Accordingly, it is neither necessary nor proper to find the power to redress private wrongs between the lines of the statutes.

### C.

■■■ Our interpretation of the scope of remedies available under the Act will not leave without recourse those who have sustained a special or peculiar injury from a violation of the Act. The same facts may support claims of both public and private nuisance, although the claims implicate different interests. *Armory Park Neighborhood Ass'n v. Episcopal Community Serv.*, 148 Ariz. 1, 712 P.2d 914, 917 (1985) (en banc); *Norton Shores v. Carr*, 81 Mich.App. 715, 265 N.W.2d 802, 805 (1978); *Maxwell v. Lax*, 40 Tenn.App. 461, 469, 292 S.W.2d 223, 226 (1954). *See also* Prosser, *Private Action for Public Nuisance*, 52 Va.L.Rev. 997, 1018 (1966); Restatement (Second) of Tort∴ § 821B comment h (1977).

■■■ A public nuisance is an act or omission that unreasonably interferes with or obstructs rights common to the public. *Metropolitan Gov't of Nashville v. Counts*, 541 S.W.2d 133, 138 (Tenn.1976); Restatement (Second) of Torts § 821B (1977); W. Keeton, *Prosser and Keeton on the Law of Torts* § 90 (5th ed. 1984). A private nuisance involves interference with a person's use and enjoyment of land.

*Haynes v. City of Maryville,* 747 S.W.2d 346, 350 (Tenn.Ct.App.1987); *Anthony v. Construction Prods., Inc.,* 677 S.W.2d 4, 7 (Tenn.Ct.App.1984); Restatement (Second) of Torts § 821D (1977).

 Conduct causing a public nuisance will also give rise to a private nuisance action when it interferes with the use or enjoyment of private property. *Village of Wilsonville v. SCA Servs., Inc.,* 86 Ill.2d 1, 55 Ill.Dec. 499, 426 N.E.2d 824, 834 (1981); *Pottawattamie County v. Iowa Dep't of Envt'l Quality,* 272 N.W.2d 448, 453 (Iowa 1978).

The pollution of a person's water supply has been recognized as conduct amounting to a private nuisance. W. Keeton, *Prosser and Keeton on the Law of Torts* § 87 n. 9 & 10 (5th ed. 1984); Prosser, *Private Action for Public Nuisance,* 52 Va.L.Rev. 997, 1019 n. 175 (1966). Thus, the Restatement notes:

> The pollution of waters is one form of conduct that may result in a private nuisance ... when there is interference with another's interest in the private use and enjoyment of land. Pollution may also result in a public nuisance ... when there is interference with a right common to all members of the public....

Restatement (Second) of Torts § 832 comment b (1977).

 The Gallahers contend that they have sustained special injuries because of the manner in which the County operated its landfill. They also insist that the County's operation of the landfill has interfered with the use and enjoyment of their farm in a substantial and material way. These assertions would support a claim for damages under a private nuisance theory if they were made in a court of competent jurisdiction. We hold today only that the Gallahers cannot seek administrative redress for interference with the use and enjoyment of their farm. They must seek these remedies in courts where the full range of legal and equitable remedies will

be available to them once they have shown that a private nuisance exists.[7]

### IV.

For the reasons stated herein, the judgment of the trial court is affirmed. The case is remanded for whatever further proceedings are necessary. The costs of this appeal are taxed in equal proportions to the Tennessee Solid Waste Disposal Control Board, Wayne County and Margaret Gallaher and their respective sureties for which execution, if necessary, may issue.

TODD, P.J., and CANTRELL, J., concur.

---

7. Fashioning appropriate legal and equitable remedies in cases such as this one where the contaminants are already in the soil and the groundwater is far from simple. *See Anderson v. W.R. Grace & Co.,* 628 F.Supp. 1219, 1233–34 (D.Mass.1986); *Moore v. Mobile Oil Co.,* 331 Pa.Super. 241, 480 A.2d 1012, 1019–20 (1984).