IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE

# KENNETH M. SEATON d/b/a KMS ENTERPRISES v. TENNESSEE STATE BOARD OF EQUALIZATION, ET AL.

### Direct Appeal from the Chancery Court for Sevier County
### Nos. 94-10-310 and 94-12-345    Bobby H. Capers, Judge, By Interchange

---

### No. E1998-00880-COA-R3-CV - Decided June 28, 2000

---

The petition in this case seeks judicial review of real property valuations established by a final order of the State Board of Equalization ("the Board"). The Board's order fixed, for *ad valorem* tax purposes, the separate values of six hotel properties in Sevier County owned by the petitioner, Kenneth M. Seaton doing business as KMS Enterprises ("the Taxpayer"). Following a bench trial, the court below reversed the Board's order because the court found that the Board erred when it calculated an expense ratio for one of the hotels. The court also questioned the Board's treatment of replacement reserves for the other hotels. The Taxpayer, as well as the respondent, Johnny King, Assessor of Property for Sevier County ("the County"), both challenge portions of the trial court's judgment. The Board contends that its decision is the correct one. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded**

SUSANO, J., delivered the opinion of the court, in which GODDARD, P.J., and SWINEY, J., joined.

Jerry H. McCarter, Gatlinburg, Tennessee, and Donna J. Orr, Sevierville, Tennessee, for the appellant, Johnny King, Assessor of Property for Sevier County, Tennessee.

C. Dan Scott, Sevierville, Tennessee, for the appellee, Kenneth M. Seaton d/b/a KMS Enterprises.

Paul G. Summers, Attorney General and Reporter, and Margaret M. Huff, Assistant Attorney General, for the appellee, State Board of Equalization.

**OPINION**

I. *Facts*

In 1989, the County, in conjunction with the State Department of Property Assessments ("the DPA"), conducted a mass reappraisal of property in Pigeon Forge. Among the properties reappraised were (1) the Grand Hotel and Convention Center ("the Grand"), and (2) several smaller hotels, namely Carlstown Inn Motel, Family Inns of America-East, Family Inns of America-South, Family Inns of America-West, and Ken's Riviera (collectively "the Smaller Hotels"). All of the above-mentioned properties are owned by the Taxpayer.

The Grand was initially valued by the DPA at over $14,000,000. Dissatisfied with this valuation, the Taxpayer appealed to the Sevier County Board of Equalization, which determined the value of the Grand to be $13,435,300. The Taxpayer appealed this valuation, as well as the valuations of the Smaller Hotels, to the State Board of Equalization, and a hearing before an administrative law judge was held on January 16, 1991. At this hearing, the Taxpayer introduced the appraisal and testimony of Norman Hall and the County introduced the testimony of Ray Kennedy. On June 14, 1991, the administrative law judge entered his initial decision and order, valuing the properties as follows:

| | |
|---|---|
| The Grand | $11,480,600 |
| Carlstown Inn Motel | 2,380,800 |
| Family Inns of America-East | 2,873,000 |
| Family Inns of America-South | 1,182,000 |
| Family Inns of America-West | 2,450,000 |
| Ken's Riviera | 1,625,000 |

Being once again dissatisfied with the valuations, the Taxpayer appealed to the Assessment Appeals Commission ("the AAC"), and a hearing was held before that body on May 13 and 14, 1992. At the hearing, the Taxpayer submitted the detailed appraisals of Robert J. Fletcher, and the DPA submitted the detailed appraisals of Ray Kennedy.

Hall, Kennedy, and Fletcher all relied primarily on the "income approach" appraisal method which is designed to determine the value of income-producing property by reducing to present value the anticipated future net earnings stream of the property. The income approach begins with a calculation of gross income. This gross income figure is then reduced by expenses. The resulting net income figure is then capitalized at an appropriate rate to arrive at the value of the income-producing property.[1]

Based on Fletcher's appraisal, the Taxpayer contended that the Grand should be valued at no more than $5,250,000. The DPA, relying upon Kennedy's appraisal, contended that the value of the Grand was $10,000,000. One of the primary differences between the competing appraisals

---

[1]The AAC found that this "income approach" appraisal method should receive primary emphasis. This determination is not an issue on this appeal.

revolved around the manner in which replacement reserves are deducted from gross income.[2] Replacement reserves represent the estimated replacement cost of personal property and the anticipated cost of maintaining the physical improvements to the property. After evaluating the evidence, the AAC found Fletcher's treatment of the replacement reserves more convincing than Kennedy's. The AAC, however, did not deduct the entire amount of replacement reserves suggested by Fletcher -- $442,815 -- but rather deducted only $152,456, the amount of the replacement reserves pertaining to the real property.[3] The AAC's determination of the appropriate amount of replacement reserves to be deducted from gross income is one of the issues in the instant appeal.

Having derived a projected net operating income of $1,222,544, the AAC then adopted a capitalization rate of 13.3% to be applied to the Grand's net operating income.[4] After the net operating income was capitalized, the result was reduced by the value of the personal property -- $489,846 -- which had been separately assessed. Applying this methodology to both the Grand and the Smaller Hotels, the AAC arrived at the following values:

| | |
|---|---|
| The Grand | $8,702,000 |
| Carlstown Motel | 1,827,000 |
| Family Inns of America-East | 2,517,000 |
| Family Inns of America-South | 778,000 |
| Family Inns of America-West | 2,094,000 |
| Ken's Riviera | 955,000 |

---

[2]Another primary difference concerned the number of rooms to be used to project gross income. Fletcher used the actual number of rooms available for rental at the time of the appraisal -- 395 -- while Kennedy used 425, the number of rooms originally available for rental. Thirty rooms had been converted to other uses. The AAC agreed with Kennedy and used a room count of 425, but the Board agreed with the Taxpayer and used a room count of 395. The 395 number resulted in a projected gross income of $5,230,048, a figure that is no longer in dispute.

[3]With respect to this narrow determination, the AAC stated as follows:

> Mr. Fletcher estimated a replacement reserve of $442,815 based on information provided by an accountant for the taxpayer, concerning the cost and useful life of the real and personal property which would need replacement. Since we are valuing only the real property and improvements and will deduct the value of tangible personal property from the final appraisal, we will use only the portion of estimated reserves attributed to the real property.

[4]The AAC essentially split the difference between the parties' contentions with respect to the Grand's capitalization rate. The AAC adopted different capitalization rates for the Smaller Hotels, each similarly derived by averaging the parties' respective capitalization rates. None of the capitalization rates are at issue on this appeal.

Both the DPA and the Taxpayer appealed to the Board, which held a hearing on February 26, 1993. The treatment of replacement reserves was again a primary point of disagreement.

The County asserted that the proper expense ratio for the Grand was 75%, a figure high enough to account for deduction of replacement reserves. This figure was based on material from three sources: the Taxpayer's actual historical data, data derived from the local market, and regional data derived from an industry-wide survey.

The Taxpayer's asserted expense ratio was 79.3%, not including replacement reserves. This ratio was based on the Taxpayer's actual historical data, data derived from the local market, and the same industry-wide survey data that had been relied upon in part by the DPA's appraiser.

The Board, stating that it was unclear whether the industry data concerning the expense ratio included replacement reserves, found the Taxpayer's argument concerning the treatment of replacement reserves more compelling. In calculating the proper deductions from projected gross income, however, the Board did not apply Fletcher's expense ratio. Instead, it applied an expense ratio derived by averaging the Taxpayer's actual historical expenses.[5] The resulting 69% expense ratio was then applied to projected gross income to arrive at projected expenses of $3,608,733.[6] When the projected expenses of $3,608,733 are deducted from the projected gross income of $5,230,048, the difference is a projected net income of $1,621,315. The Board then deducted from this latter figure all of the Taxpayer's estimated replacement reserves, both for personal property and real property, to arrive at a net operating income of $1,178,500. After application of the capitalization rate and following the deduction of personal property assessed separately, the Board determined the value of the Grand to be $8,371,000.

With respect to the Smaller Hotels, the Board stated that it "considered application of our approved method for valuing the Grand Hotel to the smaller properties, but the results are so anomalous as to be unacceptable."[7] The Board then simply affirmed the AAC's determinations as to the Smaller Hotels. Thus, with respect to the Grand, all personal property and real property replacement reserves were deducted from gross income, but, with respect to the Smaller Hotels, only the real property replacement reserves were deducted from gross income. The final valuations according to the Board are as follows:

---

[5]The Board also reduced the expense ratio by excluding tax, interest, and depreciation.

[6]As noted in footnote 2, the Board modified the AAC's determination of gross income, finding that gross income should be derived by using a room count of 395 rather than 425.

[7]The anomaly was that if the approach utilized with respect to the Grand was applied to the five Smaller Hotels, three of them would have been valued higher than contended by the County, and the other two would have been valued lower than contended by the Taxpayer.

| | |
|---|---:|
| The Grand | $8,371,000 |
| Carlstown Motel | 1,827,000 |
| Family Inns of America-East | 2,517,000 |
| Family Inns of America-South | 778,000 |
| Family Inns of America-West | 2,094,000 |
| Ken's Riviera | 955,000 |

The Taxpayer petitioned the trial court for judicial review of the Board's decision. By stipulation of the parties, the issues at trial were framed as follows:

### As to the Grand

Did the Board err in using an expense ratio based on historical data for the capitalization of income appraisal method instead of industry data? If the Board's use of historical data expense is proper, should historical data income also be used?

### As to the Smaller Hotels

Did the Board err in affirming the ACC's decision employing the capitalization of income method for the other hotels that used only a portion of the replacement reserves proposed by the Taxpayer as a reduction of gross income?

The parties appeared before the trial court on March 26, 1998. As to the first issue, the court found that

[t]he Taxpayer sustained his burden of proof that the [Board] erred in valuing the Grand Hotel real estate. The Board calculated projected gross income from market data in its capitalization of income appraisal method, but erred in calculating expenses by application of a ratio derived from the Taxpayer's actual historical expenses.

The trial court went on to specifically find that

the theory of appraisal expounded by Fletcher is the proper theory for the valuation of The Grand Hotel. The Court makes a specific finding of the credibility of Fletcher in respect to the method of valuation to use and the implementation of that method as to The Grand Hotel.

The court then applied Fletcher's method, correcting for mathematical and typographical errors, and arrived at a value for the Grand of $5,360,481.

As to the second issue, the court ruled that the Board, in affirming the AAC as to the Smaller Hotels, erred in failing to deduct personal property replacement reserves, as well as real property replacement reserves, from projected gross income. More specifically, the court found

> that the valuation of the Smaller Hotels stated in the appraisals of Jeffrey Fletcher, with certain corrections of mathematical and typographical errors, and using the capitalization rate adopted by the Board (rather than Fletcher's capitalization rate) is the fair market value of the properties for ad valorem real property tax purposes.

The court accordingly valued the properties as follows:

| | |
|---|---|
| The Grand | $5,360,481 |
| Carlstown Motel | 1,675,000 |
| Family Inns of America-East | 2,394,000 |
| Family Inns of America-South | 751,000 |
| Family Inns of America-West | 2,021,000 |
| Ken's Riviera | 820,000 |

The County now appeals the trial court's valuation of the Grand. The Taxpayer appeals the trial court's valuation of the Smaller Hotels.

## II. *Applicable Law*

Our review in this case is governed by principles recently enunciated by us in our opinion in ***Willamette Industries, Inc. v. Tennessee Assessment Appeals Commission***, 11 S.W.3d 142, 147-48 (Tenn. Ct. App. 1999) (perm. app. denied February 7, 2000), an opinion that was recommended for publication by the Supreme Court:

> Generally speaking, courts will "defer to decisions of administrative agencies when they are acting within their area of specialized knowledge, experience, and expertise." ***Wayne County v. Tennessee Solid Waste Disposal Control Board***, 756 S.W.2d 274, 279 (Tenn.App. 1988). Thus, judicial review of such determinations is governed by "the narrow, statutorily defined standard contained in [T.C.A.] § 4-5-322(h) rather than the broad standard of review used in other civil appeals." ***Wayne County***, 756 S.W.2d at 279. Specifically, T.C.A. § 4-5-322(h)(5)[8] provides, as relevant here, that the reviewing court

---

[8]T.C.A. § 4-5-322 is contained in the Uniform Administrative Procedures Act, codified at T.C.A. § 4-5-101, *et seq.*

may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

* * * *

(5) Unsupported by evidence which is both substantial and material in the light of the entire record.

In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Thus, we will not substitute our judgment regarding the weight of the evidence for that of the agency, even where the evidence could support a different result. *Wayne County*, 756 S.W.2d at 279 (citing *Humana of Tennessee v. Tennessee Health Facilities Comm'n*, 551 S.W.2d 664, 667 (Tenn. 1977)); *Grubb v. Tennessee Civil Serv. Comm'n*, 731 S.W.2d 919, 922 (Tenn.App. 1987); *Hughes v. Board of Commissioners*, 204 Tenn. 298, 319 S.W.2d 481, 484 (1958)). Stated another way,

[a]n agency's factual determination should be upheld if there exists "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration."

*Wayne County*, 756 S.W.2d at 279 (quoting *Southern Ry. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984); *Sweet v. State Technical Inst.*, 617 S.W.2d 158, 161 (Tenn.App. 1981)). As further explained in *Wayne County*,

[t]he general rules governing judicial review of an agency's factual decisions apply with even greater force when the issues require scientific or technical proof. Appellate courts have neither the expertise nor the resources to evaluate complex scientific issues de novo. When very technical areas of expertise are involved, they generally defer to agency decisions,

and will not substitute their judgment for that of the agency on highly technical matters.

However, the court's deference to an agency's expertise is no excuse for judicial inertia. Even in cases involving scientific or technical evidence, the "substantial and material evidence standard" in [T.C.A.] § 4-5-322(h)(5) requires a searching and careful inquiry that subjects the agency's decision to close scrutiny.

*Wayne County*, 756 S.W.2d at 280 (citations omitted).

With regard to the valuation of real property for tax purposes, T.C.A. § 67-5-601(a) mandates that

[t]he value of all property shall be ascertained from the evidence of its sound, intrinsic and immediate value, for purposes of sale between a willing seller and a willing buyer without consideration of speculative values....

III. *Analysis*

A. The Grand

The first issue on appeal is whether the Board erred, in valuing the Grand, by applying to projected gross income an expense ratio derived by averaging the Taxpayer's actual historical expenses. With respect to this determination, the Board stated the following:

In the absence of clear proof as to the extent to which the industry data reflected replacement reserves, we must make do with the actual data reconstructed as best we can to exclude expenses for depreciation, interest and property taxes. We must only add some estimate of the replacement reserves to these actual expenses, since it is clear that the taxpayer's actual expenses did not include this item. The taxpayer's estimate of replacement reserves was better explained, and it appears from the testimony that the [DPA's] appraiser may not have considered some items appropriate for the reserves.

When depreciation, interest, and property taxes are excluded from the taxpayer's actual expenses, the expense ratio averages about 69% for the four years for which the data was available. We must deduct these expenses from gross income, along with the taxpayer's estimate

of replacement reserves, to derive our estimated net operating income....

Thus, the Board looked to the Taxpayer's actual expense ratios for the four years preceding the 1989 appraisal to arrive at an average expense ratio of 69%. It then applied this ratio to the gross income figure to arrive at estimated expenses and then proceeded to subtract the estimated expenses from the estimated gross income to arrive at estimated net operating income.

We find and hold that the trial court substituted its judgment for that of the Board and thus erred in reversing the Board's decision. We have carefully scrutinized the record before us and found that the evidence, while supporting the trial court's reasoning for its determination, also supports the Board's determination. All three appraisers, in selecting an expense ratio, examined the historical performance of the Grand, the local market, and regional data available from an industry-wide survey. Each appraiser utilized these data sets differently. Kennedy used the data to form his own independent figure. Fletcher settled on a figure that is very close to the Grand's actual expense ratio for 1988 and almost identical to an industry-wide figure. Hall utilized the market and industry data to ensure that the Grand's actual historical expense ratios were reasonable. Hall concluded, after reviewing the market and industry data, that the Grand's actual ratio for the prior two years was reasonable. He then applied that ratio to his projected income for the Grand to ultimately arrive at net operating income. Therefore, Hall's expense ratio, though tested against market and industry data for reasonableness, was derived from actual historical expenses. Although there is evidence in the record to support the notion that market and industry data should have more of an impact on an historical expense ratio, we find that there is substantial and material evidence to support the Board's decision to utilize an expense ratio derived by averaging historical expense ratios of the Grand. Valuation of income-producing property is a highly technical process, one with which the Board has substantial expertise. The trial court erred in substituting its judgment for that of the Board. Accordingly, we reverse the trial court's judgment. We find and hold, as did the Board, that the value of the Grand is calculated as follows:

| | |
|---|---|
| Projected Gross Income | $5,230,048 |
| Less: Estimated Expenses (69%) | 3,608,733 |
| Net Operating Income Before Reserves | $1,621,315 |
| Less: Replacement Reserves | 442,815 |
| Net Operating Income | $1,178,500 |
| | |
| Net Operating Income | $1,178,500 |
| Divided by Capitalization Rate of | .133 |
| Equals | $8,860,902 |
| Less: Personal Property Value | 489,846 |
| Value for Tax Purposes | $8,371,056 |
| | |
| Rounded to | $8,371,000 |

B. The Smaller Hotels

The second issue on appeal is whether, with respect to the Smaller Hotels, the Board erred in affirming the AAC, thereby allowing deduction of real property replacement reserves but disallowing deduction of personal property replacement reserves. As stated previously, the AAC chose to deduct only real property replacement reserves because the AAC was "valuing only the real property and improvements and [would] deduct the value of tangible personal property from the final appraisal."

In considering this issue on appeal, the Board stated as follows:

> Based on their experience before the Commission, the parties no doubt expected that we would either approve the proof and arguments of one party or the other in their entirety, or adopt our own approach for the Grand Hotel which would simply be applied equally to the smaller hotels. No proof or argument concerning these smaller properties was offered at our hearing, although the appraisal reports submitted to the Commission are certainly part of the record.

> With the assistance of staff, we have considered application of our approved method for valuing the Grand Hotel to the smaller properties, but the results are so anomalous as to be unacceptable. We determined the value of the Grand with the benefit not only of the fine appraisal reports submitted by the parties, but also having read transcripts of testimony by the appraisers and heard the arguments of able counsel. We do not have these advantages in the case of the smaller properties, and having no basis to disturb the findings and conclusions of the Commission, we affirm the values for the smaller properties as set forth in the Commission's final decision.

Specifically, in applying the method the Board used to value the Grand to the Smaller Hotels, the Board found that three of the five hotels were valued higher than asked by the County and two of the five were valued lower than requested by the Taxpayer. Finding this result to be unacceptable, the Board chose to simply affirm the AAC's determination as to the Smaller Hotels.

Concerning the treatment of replacement reserves for the Smaller Hotels, we find that the trial court again substituted its judgment for that of the Board, and thus erred in reversing the Board's decision. The three appraisers treated replacement reserves differently. Hall's appraisal does not mention replacement reserves. In addition to his appraisal, he prepared a report that he referred to as an "allocation of value." This calculation accounted for replacement reserves in arriving at a value "for tax purposes." In this latter calculation, Hall deducted only replacement reserves for personal property and did not mention those for real property, a procedure opposite from the procedure utilized by the AAC and affirmed by the Board. Hall acknowledged that his

"allocation of value" approach was "controversial" but that "maybe it did make sense." In any event, Hall stood behind his separately-stated appraisal.

The other two appraisers differed from Hall, and from each other, in their treatment of replacement reserves. Fletcher deducted reserves for both real and personal property. Kennedy, on the other hand, testified that his expense ratio of 75% was more than enough to cover deduction of replacement reserves. Upon a close examination of Kennedy's appraisal and testimony, however, it is clear that the replacement reserves of which he was speaking were real property replacement reserves only. Thus, the record contains evidence suggesting (1) that only personal property replacement reserves should be deducted; (2) that both personal and real property replacement reserves should be deducted; and (3) that only real property replacement reserves should be deducted. In light of this fact, and in light of the high level of deference that should be accorded the Board due to their expertise in the highly technical subject area of property valuations, we hold that the trial court erred in substituting its judgment for that of the Board. Accordingly, the valuations of the Smaller Hotels are those determined by the AAC and affirmed by the Board. They are as follows:

### Carlstown Motel

| | |
|---|---:|
| Projected Gross Income | $ 894,600 |
| Less: Estimated Expenses | 581,490 |
| Net Operating Income Before Reserves | $ 313,110 |
| Less: Replacement Reserves | 51,069 |
| Net Operating Income | $ 262,041 |
| | |
| Net Operating Income | $ 262,041 |
| Divided by Capitalization Rate of | .1362 |
| Equals | $1,923,943 |
| Less: Personal Property Value | 96,730 |
| Value for Tax Purposes | $1,827,213 |
| | |
| Rounded to | $1,827,000 |

## Family Inns of America-East

| | |
|---|---:|
| Projected Gross Income | $1,040,600 |
| Less: Estimated Expenses | 645,172 |
| Net Operating Income Before Reserves | $ 395,428 |
| Less: Replacement Reserves | 41,355 |
| Net Operating Income | $ 354,073 |
| | |
| Net Operating Income | $ 354,073 |
| Divided by Capitalization Rate of | .1362 |
| Equals | $2,599,655 |
| Less: Personal Property Value | 82,491 |
| Value for Tax Purposes | $2,517,164 |
| | |
| Rounded to | $2,517,000 |

## Family Inns of America-South

| | |
|---|---:|
| Projected Gross Income | $ 449,400 |
| Less: Estimated Expenses | 314,580 |
| Net Operating Income Before Reserves | $ 134,820 |
| Less: Replacement Reserves | 22,325 |
| Net Operating Income | $ 112,495 |
| | |
| Net Operating Income | $ 112,495 |
| Divided by Capitalization Rate of | .1405 |
| Equals | $ 800,676 |
| Less: Personal Property Value | 22,529 |
| Value for Tax Purposes | $ 778,147 |
| | |
| Rounded to | $ 778,000 |

**Family Inns of America-West**

| | |
|---|---|
| Projected Gross Income | $ 950,316 |
| Less: Estimated Expenses | 617,705 |
| Net Operating Income Before Reserves | $ 332,611 |
| Less: Replacement Reserves | 38,351 |
| Net Operating Income | $ 294,260 |
| | |
| Net Operating Income | $ 294,260 |
| Divided By Capitalization Rate of | .1362 |
| Equals | $2,160,499 |
| Less: Personal Property Value | 66,254 |
| Value for Tax Purposes | $2,094,245 |
| | |
| Rounded to | $2,094,000 |

**Ken's Riviera**

| | |
|---|---|
| Projected Gross Income | $ 442,200 |
| Less: Estimated Expenses | 280,377 |
| Net Operating Income Before Reserves | $ 161,823 |
| Less: Replacement Reserves | 24,177 |
| Net Operating Income | $ 137,646 |
| | |
| Net Operating Income | $ 137,646 |
| Divided by Capitalization Rate of | .1405 |
| Equals | $ 979,687 |
| Less: Personal Property Value | 24,391 |
| Value for Tax Purposes | $ 955,296 |
| | |
| Rounded to | $ 955,000 |

Our decision to reverse the trial court and reinstate the decision of the Board renders moot the Taxpayer's argument concerning the trial court's correction of certain typographical and mathematical errors in Fletcher's appraisals.

## IV. Conclusion

The judgment of the trial court is reversed. The case is remanded for entry of an order consistent with this opinion and collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the Taxpayer.