IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 8, 2002 Session

## JUDY RODRIGUEZ v. THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

**A Direct Appeal from the Chancery Court for Davidson County**
**No. 01-403-III     The Honorable Ellen Hobbs Lyle, Chancellor**

---

**No. M2001-02500-COA-R3-CV - Filed October 16, 2002**

---

Municipal employee filed a petition for review of civil service commission order terminating her employment. The chancery court affirmed the order of the commission, finding that the record contained substantial and material evidence to support the termination. The employee has appealed. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Phillip L. Davidson, Nashville, For Appellant, Judy Rodriguez

Kelli A. Hass, Rita M. Roberts-Turner, Nashville, For Appellee, Metropolitan Government of Nashville and Davidson County

**OPINION**

Judy Rodriguez ("Rodriguez") was terminated by Defendant, Metropolitan Government of Nashville and Davidson County ("Metropolitan"), after eight and one half years of service as a civilian employee with the Metropolitan Police Department. At the time of her termination, Rodriguez was employed in the department's Records and Teleserve Division, where she had access to confidential information concerning police operations.

In September of 1998, during the course of a drug investigation involving Laurie Perry, the mother of Rodriguez's grandson, vice officers received a tip from a confidential informant concerning possible criminal evidence located at Rodriguez's home. Vice officers learned that Rodriguez received approximately $16,000.00 in cashier's checks from Perry. According to the

information, the checks were stashed in a storage box underneath Rodriguez's bed. A subsequent search of Rodriguez's home substantiated the informant's tip.

On September 16, 1998, officers from the Metropolitan Police Department interviewed Rodriguez at work regarding her association with Perry. Rodriguez admitted to holding the money for Perry, but insisted that her association with Perry was turbulent and limited only to instances in which Rodriguez picked up her grandson for court-ordered visitation. Rodriguez further acknowledged that she was aware that Perry had at least one prior drug arrest in 1991.[1] Although Rodriguez admitted that the money belonged to Perry, she denied receiving the money from Perry, forcing the officers to probe Rodriguez for the identity of the person who delivered the checks. After initially refusing to identify the courier, Rodriguez, at the urging of the vice officers, broke silence and identified her friend, James Powell, as the person who delivered the checks for Perry. Rodriguez claimed that Powell told her that Perry wanted Rodriguez to hold the money because someone had tried to break into Perry's home to steal the money.[2]

The officers also questioned Rodriguez about her association with her son, Ricky Rodriguez ("Ricky"). Specifically, the officers inquired into whether Rodriguez was aware of Ricky's prior drug arrests and current involvement in "the marijuana business." After denying knowledge of Ricky's present involvement with drugs and answering a few background questions regarding her boyfriend William Smith ("Smith"), Rodriguez consented to the officers' request to search her home for the checks. The search produced the checks, but uncovered no other evidence linking Rodriguez with any potential crime.

Upon concluding their search of Rodriguez's home, the officers asked Rodriguez to participate in two controlled calls, one to Perry, and the other to Powell. With vice officers present and recording the conversation, Rodriguez first telephoned Perry to inform her of the search and seizure of the money. During this conversation, Perry made "suspicious or damaging" statements that "concerned" vice officers.[3] Specifically, the officers were concerned with Rodriguez's statement

---

[1] According to FBI Identification Reports contained in the record, Perry was charged in 1990 with felony possession of marijuana and sentenced to one year of probation. That same year, Perry was charged with possession of a controlled substance for resale and fined $250.00.

[2] The parties dispute Rodriguez's understanding and explanation of the reasons Perry wanted her to hold the money. Rodriguez contends that her explanation to Metropolitan was that Perry was scared that someone was trying to steal the money, and that the money was intended for Rodriguez's grandson's education. Metropolitan asserts that Rodriguez has offered two different explanations for why Perry wanted her to hold the money. According to Metropolitan, Rodriguez initially told officers that Powell told her Perry wanted her to keep the money because someone had tried to break into Perry's home, mentioning nothing of her grandson's education. Metropolitan asserts that it wasn't until after her September 16 meeting with the officers that Rodriguez "adopted" the story about her grandson's education. In her initial order, the administrative law judge agreed with Metropolitan, finding that Rodriguez had offered two different explanations for holding the checks.

[3] In her review of the record, the administrative law judge concluded that the vice officers were "concerned" by statements made by Rodriguez that they found "suspicious or damaging."

that if she "had known that [the money was dope money] I could have put it somewhere else." The officers were further concerned by Rodriguez's suggestion that she and Perry get together to determine what Rodriguez was going to tell the police about the money.

Rodriguez made a second controlled call moments later to Powell. During the conversation, Rodriguez informed Powell of her interview with Metropolitan officers and the fact that she had revealed Powell's involvement. Powell responded by stating, "I got to clean my house out."[4] Powell further asserted that he would corroborate Rodriguez's statement to officers that she was told by Powell that the money was being entrusted to Rodriguez because someone tried to break into Perry's home. The monitoring officers interpreted Powell's statement as evidence that Rodriguez's story was fabricated.

On June 8, 1999, Rodriguez was charged with violating General Order 95-19, Section VI, Personal Behavior, Part T - Association with Criminals, which states:

> An employee shall not knowingly associate with persons convicted of felonious criminal offenses or those who have shown a pattern of criminal behavior, except in the performance of duty.

Metropolitan found that Rodriguez violated this order as a result of her knowing association with Perry, Rodriguez's two sons, Ricky and Gary Rodriguez ("Gary"), and Smith, all of whom had prior felony convictions.

On March 11, 1999, Rodriguez voluntarily consented to a polygraph examination. Captain Joe Ogg ("Ogg") of the Internal Security Section administered the examination. Although Ogg stated that it was his belief that Rodriguez truthfully revealed that she did not know or suspect that the checks came from the sale of drugs, he failed to ask Rodriguez about her associations with Perry, Ricky, Gary, or Smith. A continuation polygraph was administered on April 29, 1999, but the results of the examination were lost.

Following Metropolitan's investigation into the charges, a hearing was held before the department's disciplinary board on July 23, 1999. After listening to evidence presented by Rodriguez and the investigating officers, the board recommended that Rodriguez be terminated pursuant to Chapter 6, Section 6.7(11), for violation of General Order 95-19, Section VI, Personal Behavior, Part T - Association with Criminals. Assistant Chief Charles Smith concurred with the board's recommendation and ordered termination of Rodriguez's employment effective July 24, 1999.

---

[4] Upon hearing this statement, vice officers immediately proceeded to Powell's home. Once there, officers discovered Rodriguez's son, Gary Rodriguez, whom they found to be in possession of marijuana. The vice officers also detained Randy Ward on the scene when they found a box of pills that they considered drug paraphernalia in his possession.

Rodriguez appealed her termination to the Civil Service Commission ("Commission") on July 27, 1999. Administrative Judge Margaret Robertson ("ALJ") was assigned to the appeal, and a hearing was held on March 8, 2000. On July 31, 2000, the ALJ entered an initial order upholding Rodriguez's termination. The ALJ found that Metropolitan had just cause to find Rodriguez guilty of violating General Order 95-19, as she knowingly associated with Perry, Smith, and her two sons, which association violated Chapter C, Section 6-7 (11) of the Rules of the Metropolitan Civil Service Commission providing for disciplinary action, including discharge.

On August 23, 2000, Rodriguez opposed the ruling of the ALJ and appealed the decision to the Civil Service Commission. On September 12, 2000, the Commission held a review of the initial order. At this hearing, Rodriguez petitioned the Commission to enter the Internal Affairs Security Investigation file for this case into the Technical Record. Rodriguez argued that the file was not originally entered into the record or considered by the judge. On September 25, 2000, the Commission remanded this issue to the ALJ for a determination of whether the file was entered into the record and appropriately considered by the judge, and, if not, whether there was an excusable reason justifying the omission.

Without the aid of the ALJ's guidance, both parties agreed on October 10, 2000, that the Internal Affairs file should be placed into the record. On November 6, 2000, the ALJ refused to consider the results from Rodriguez's polygraph tests, and denied her request to enter the tests into the Technical Record. On December 12, 2000, the Commission considered Rodriguez's appeal and, by final order, affirmed the initial order terminating Ms. Rodriguez's employment.

Rodriguez petitioned the chancery court for review of the Commission's final order. By order filed July 16, 2001, the court affirmed the Commission's decision, finding that there was substantial and material evidence in the record to support the Commission's conclusion that Rodriguez knowingly associated with Perry and violated the subject general order. As a result of this finding, the court determined that it was unnecessary to consider whether Rodriguez knowingly associated with Smith or her two sons. Upon the trial court's denial of Rodriguez's motion alter or amend the judgment, Rodriguez appeals and presents four issues for review, as stated in her brief:

> (1) Whether there was substantial and material evidence in the record to support a finding that Rodriguez knowingly associated with felons or persons involved in criminal activity;
>
> (2) Whether the ALJ's refusal to consider the admission of the Internal Affairs file into evidence constituted an abuse of discretion which adversely affected Rodriguez's right to a fair hearing;
>
> (3) Whether the ALJ's refusal to admit Rodriguez's polygraph results into evidence was an abuse of discretion that adversely affected her right to a fair hearing; and

-4-

(4) Whether General Order 95-19, Section VI, Part 7, was unconstitutional as applied to Rodriguez.

Ms. Rodriguez asserts in her first issue that there was no substantial or material evidence to support a finding that she violated general order 25-19, Section VI, Section T. The standard of review for the chancellor on appeal of administrative proceedings is governed by T.C.A. § 4-5-322 (h)(1998) as follows:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5) Unsupported by evidence which is both substantial and material in the light of the entire record.
>
> In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

The scope of review in this Court is the same as in the trial court, to review findings of fact of the administrative agency upon the standard of substantial and material evidence. *Gluck v. Civil Serv. Comm'n*, 15 S.W.3d 486 (Tenn. Ct. App. 1999). Although what amounts to substantial and material evidence is not clearly defined by the subject statute, it is generally understood that "it requires something less than a preponderance of the evidence, (citations omitted) but more than a scintilla or glimmer." *Wayne County v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988). "Substantial evidence is not limited to direct evidence but may also include circumstantial evidence or the inferences reasonably drawn from direct evidence." *Id*. at 280.

Although this Court may consider evidence in the record that detracts from the weight of the evidence, the Court is not allowed to substitute its judgment for that of the agency concerning the weight of the evidence. T.C.A. § 4-5-322 (h); *see also Gluck v. Civil Serv. Comm'n*, 15 S.W.2d 486 (Tenn. Ct. App. 1999). The evidence before the administrative body must be such relevant evidence as a reasonable mind might accept as adequate to support a rational conclusion such as to furnish a reasonable sound basis for the action taken. *Id.* at 490.

The technical record in this case includes, among other documents, a written transcript of Rodriguez's recorded interview with vice officers on September 16, 1998, transcripts of the controlled calls Rodriguez made to Perry and Powell later that day, and a transcript of the hearing held before the ALJ in March of 2000. Based on the evidence contained within these documents, we uphold the chancery court's determination that there is substantial and material evidence in the record to find that Rodriguez violated the general order prohibiting knowing association with felons or persons engaged in a course of criminal conduct.

To summarize Rodriguez's position in this case, she contends that Metropolitan lacked any factual evidence to establish that she engaged in a knowing association with Perry. Stated differently, Rodriguez argues that she had no knowledge or reason to believe that the money was the proceeds of illegal drug sales. Rodriguez further argues that she was aware of Perry's 1991 drug conviction, but maintains that she did not know or have reason to believe that Perry was a "major player" in the drug dealing industry at the time she accepted the money. The documents in the record cast a suspicious light on Rodriguez's argument. The transcript of proceedings provides the richest source of substantial and material evidence refuting Rodriguez's story and supporting the Commission's decision to terminate.

During the course of the administrative hearing, several individuals were called to testify before the ALJ. Among those called were Lieutenant Percy Smith, Assistant Chief Charles Smith, Officer Jesse Franklin Burchwell, and Rodriguez. The testimony offered by Lieutenant Smith, Assistant Chief Smith, and Officer Burchwell painted a consistent and rational picture of a knowing association between Rodriguez and Perry. Lieutenant Smith and Assistant Chief Smith both concluded that Rodriguez's acceptance of the cashier's checks from Powell, on behalf of Perry, constituted strong evidence of a knowing association. They further testified that Rodriguez's "inconsistent" explanations for the reasons Perry asked her to hold the money cast suspicion upon Rodriguez's claim that she lacked any knowledge that criminal activity was afoot. Lieutenant Smith noted that in her original statement given to Vice on September 16, 1998, Rodriguez stated that Perry wanted her to hold the money because "someone was breaking in her house and she didn't want anything to happen to it." It wasn't until after this initial statement, that Rodriguez mentioned that Perry wanted her to hold the money because it was for Rodriguez's grandson's education.[5] Assistant Chief Smith noted Rodriguez subsequently offered a third explanation for the money, claiming it was from Perry's business.

In their testimony, the Assistant Chief Smith and Officer Burchwell both concluded that Rodriguez was aware, or at least should have been aware based on the circumstances, that the money was the proceeds of past drug deals. Assistant Chief Smith noted that the money itself "was very unusual because it was in cashier's checks, and there were safer ways of taking care of that money such as in bank accounts...." Officer Burchwell testified that the fact that Perry used a third party

---

[5] Rodriguez argues that her explanation is not inconsistent. She contends that the money was for her grandson's education and she was holding it because Perry was afraid that the money would be lost if someone tried to break into her home again.

to deliver the money to Rodriguez, and the fact that Rodriguez hid the money in a safe box underneath her bed, created an air of suspicion with regard to the source or purpose of the money.

Rodriguez's personal relationship with Perry also raised suspicion among law enforcement officials. To reiterate, the record indicates that Perry is the mother of Rodriguez's grandson. Ricky Rodriguez is the father of the child, however, he and Perry never married. In his testimony, Lieutenant Smith noted that he found it "strange" that Perry would entrust Rodriguez, a non-family member, with $16,000.00 in spite of their admittedly tense and often unfriendly relationship.

Rodriguez's hesitance to identify Powell, and her controlled conversation with him on September 16, were also considered by law enforcement officials as evidence that Rodriguez was knowingly associated with convicted felons or persons involved in a pattern of criminal activity. During his direct examination, Lieutenant Smith expressed concern regarding this hesitation, and stated that if "things are on the up-and-up" Rodriguez should not have felt like she had to hide Powell's identity. Assistant Chief Smith shared the Lieutenant's suspicions, noting that during the controlled call Powell responded to news that police had questioned Rodriguez about the money by stating "I got to clean my house out." Immediately after Powell offered this statement, the Chief noted that Vice proceeded to Powell's home and discovered drugs on the premises. The Chief concluded that "the nature of the call was such that it made me think that she would have known that the money was drug money."

In her cross examination of Rodriguez at the administrative proceeding, Metropolitan's counsel highlighted suspicious events that the Commission considered substantial and material evidence to support its decision to terminate. Specifically, Metropolitan pointed out that Rodriguez unexpectedly received $16,000.00 in cashier's checks from a third party, but never bothered to contact Perry to ask her exactly why she was to hold the money. Furthermore, Rodriguez admitted that she didn't even know Powell and Perry were acquaintances when she received the money, yet she never questioned Powell as to why he was chosen to deliver the money. Metropolitan reiterated its concern as to why Perry would entrust Rodriguez with $16,000.00 when the women, according to Rodriguez's testimony, hadn't spoken in months and did not share a friendly relationship. Rodriguez had no explanation for Perry's decision, other than to suggest that the money was allegedly for her grandson's education.

Metropolitan also questioned Rodriguez regarding her handling of the money. According to her testimony, Rodriguez failed to ask Perry why she hadn't put the money in a bank account or safe deposit box for safekeeping; nor, did Rodriguez take these actions by her own initiative. In addition, Rodriguez admitted that she did not know how long she was supposed to keep the money, and did not contact Perry to find out.

After analyzing the evidence contained in the trial record, we find that evidence relied upon by the Commission furnishes a "reasonably sound basis for the action under consideration." We find that the record contained substantial and material evidence that Rodriguez violated General Order 95-19, Section VI, Personal Behavior, T - Association with Criminals, by knowingly associating with Perry. Finding that Rodriguez violated General Order 95-19 by her association with Perry, we

conclude, as the chancery court did, that it is unnecessary to determine whether there is substantial and material evidence in the record to support a conclusion that Rodriguez knowingly associated with Smith or her two sons.

Accordingly, the order of the chancery court is affirmed. Costs of the appeal are assessed against the appellant, Judy Rodriguez, and her surety. The remaining issues are pretermitted.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.