IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 7, 2021 Session

**BUDDY DAVIS v. TENNESSEE BOARD OF APPEALS**

**Appeal from the Chancery Court for Davidson County**
**No. 19-1183-IV      Russell T. Perkins, Chancellor**

_____

**No. M2020-01255-COA-R3-CV**

_____

A preferred service employee appealed the termination of his employment. After failing to obtain relief at the Step I and Step II reviews, the employee requested a Step III hearing before the Tennessee Board of Appeals. The Board determined that the employee engaged in conduct unbecoming of an employee in state service but termination was too harsh a punishment. So it modified the employee's discipline to a one-step demotion and recommended that he be transferred. The employee sought judicial review of the Board's decision. The chancery court reversed, finding that the decision to demote the employee was not supported by substantial and material evidence. We reverse the chancery court and affirm the decision of the Board.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter, Andrée Sophia Blumstein, Solicitor General, Colleen E. Mallea, Assistant Attorney General, and Rachel A. Newton, Assistant Attorney General, for the appellant, Tennessee Board of Appeals.

Mathew R. Zenner, Brentwood, Tennessee, for the appellee, Buddy Davis.

OPINION

## I.

### A.

Buddy Davis is a preferred service employee with over twenty-five years of service with the Tennessee Department of Correction ("TDOC"). In early 2019, he served as a Correctional Unit Manager at the Bledsoe County Correctional Complex. In that role, he was responsible for the correctional officers assigned to his unit and the safety and security of the inmates within the unit. Each unit included multiple pods where inmates were housed.

One morning a nurse informed a pod officer, James Olson, that one of the inmates needed to be moved to suicide watch. Placing an inmate on suicide watch meant transferring the inmate to another cell where he could be monitored. Officer Olson and other correctional officers, including Correctional Officer Justin McDonald, moved the inmate to a suicide-watch cell. But, in doing so, they used force. TDOC policy required pre-authorization for use of force during such a move. If force was used without pre-authorization, policy required officers to immediately report the use of force to their supervisor, who was Mr. Davis.

The next day, TDOC opened an investigation into the unreported use of force. The investigation included reviewing video footage of the incident, questioning Mr. Davis and the officers involved in the move, and obtaining written statements. The investigation ultimately determined that the force used during the transfer was appropriate, but not properly reported. So the warden started a disciplinary action against the officers involved in moving the inmate.

Several days later, one of the officers involved committed suicide and new information surfaced, leading TDOC to reopen its investigation. Two new investigators interviewed Mr. Davis. According to the investigator in charge, Mr. Davis maintained that he only learned of the move of the inmate after the fact. But, when Mr. Davis was presented with text messages from the deceased correctional officer[1] suggesting that Mr. Davis had advance notice of the move, Mr. Davis became emotional. At that point, Mr. Davis conceded that it was "possible" he knew about the impending move of the inmate and that he may have ordered the inmate moved to the suicide-watch cell. The investigator in charge characterized Mr. Davis as uncooperative with the investigation at first, only becoming cooperative after seeing the text messages. The written investigative report concluded:

---

[1] The text messages were directed to another correctional officer involved in the move of the inmate.

Davis was very deceptive at first regarding any knowledge of the use of force and at one point asking [another investigator] what is a use of force? The written statements of all involved show Davis had knowledge of the use of force and [the deceased officer's] text message confirms Davis knew and ordered the officers to transfer [the inmate] to a suicide watch cell.

After receiving a copy of the report, the warden terminated Mr. Davis's employment. The termination letter cited multiple grounds for discipline, including that Mr. Davis's "untruthfulness interfered with the investigative process and compromised the integrity of the internal affairs investigation."[2]

B.

Mr. Davis appealed his termination through the procedure provided for in the Tennessee Excellence, Accountability, and Management or TEAM Act. *See* Tenn. Code Ann. § 8-30-318(h) (Supp. 2021). "The TEAM Act's appeal procedure is a three-step process." *Tenn. Dep't of Corr. v. Pressley*, 528 S.W.3d 506, 520 (Tenn. 2017). Mr. Davis's termination was upheld at both Step I and Step II. So Mr. Davis requested a Step III appeal before the Tennessee Board of Appeals. *See* Tenn. Code Ann. §§ 8-30-108(f) (2016); -318(h)(1)(C).

The Board conducted a hearing, which revealed varying accounts of the transfer of the inmate to suicide watch. Mr. Davis recounted his memories of the events surrounding the move. The inmate was moved to the suicide-watch cell at approximately 10:00 a.m. Mr. Davis conceded that he would have been in the unit around that time. But he testified that he did not learn of the move until Officer McDonald told him about it sometime around 2:00 p.m. or later that day. Officer McDonald reported that the inmate refused to "cuff up" at first but then the move occurred without any problems. Mr. Davis testified that he first learned that the move involved the use of force the following day when a captain asked him about the incident. Mr. Davis denied that Officer McDonald sought authorization to use force prior to the move and that Officer McDonald reported the use of force following the move.

Officer McDonald offered contradicting testimony. Officer McDonald testified that he was enlisted to assist with the inmate move by Officer Olson. After speaking with Officer Olson, Officer McDonald went to the unit management office to speak with Mr. Davis. Officer McDonald explained that he wanted to make sure that Mr. Davis was

---

[2] Another factor in Mr. Davis's termination was a social media post related to the suicide of the correctional officer. The warden believed the post violated TDOC policy. But at the Step II appeal, the Tennessee Department of Human Resources determined that Mr. Davis's post did not violate TDOC policy. So the Board did not consider it as a basis for termination in the Step III appeal.

aware of the situation and agreed that the inmate needed to be moved. He also asked Mr. Davis about what should be done if the inmate refused to take cuffs. Officer McDonald claimed that Mr. Davis told him that "the inmate had to move regardless" and to "do what I needed to do."

The inmate move did not go well. As Officer McDonald's question to Mr. Davis seemingly predicted, the inmate refused to "cuff up." Instead the inmate attempted to cut his wrists with a belt buckle. So Officer McDonald and other officers entered the cell. Officer McDonald grabbed the inmate's upper body and put the inmate's hands behind his back. The other officers held the inmate's torso and feet. Together they lifted the inmate over their heads and carried him to the suicide-watch cell. During this process, Officer McDonald made a call over the radio to a sergeant because a taser might be needed.

After the move, Officer McDonald returned to the unit management office. He asked to speak with Mr. Davis alone in his office. During that private meeting, Officer McDonald testified that he went over the details of the move and asked Mr. Davis whether there had been a use of force that needed to be reported. According to Officer McDonald, Mr. Davis asked whether anyone was injured or if there were any marks. After Officer McDonald replied in the negative, Mr. Davis told him not to worry about it.

Testimony revealed that other personnel were in the unit management office that day. One was Sergeant Nicole Brooks. Sergeant Brooks was filling in as the unit's clerical officer. Her responsibilities included entering cell bed assignments into the computer. Before the move, she answered a call from Officer Olson. She placed the call on speaker and heard Officer Olson report that the nurse had told him to put the inmate on suicide watch. According to Sergeant Brooks, Mr. Davis was in the room standing at the count board, which had the inmates' names and TDOC numbers on magnetic strips that were placed by cell numbers. Upon hearing the call, Mr. Davis grabbed a magnet and said "I guess we're going to move [the inmate] from 204 to 101," which was the suicide-watch cell. Sergeant Brooks testified that Officer McDonald was standing in the doorway at the time. Sergeant Brooks thought Mr. Davis made the statement so that she could enter the move into the computer and so that Officer McDonald could make the move.

Sergeant Brooks did not participate in moving the inmate, but she learned about it soon after. Approximately 10 minutes after the move, Officer McDonald returned to the unit management office and asked Mr. Davis if he could speak with him. Sergeant Brooks recalled that this took place well before 2:00 p.m. Officer McDonald went with Mr. Davis to his office, which was a couple of doors down. Although Sergeant Brooks was not in the room, right after the two men met, Officer McDonald shared the details of the move with Sergeant Brooks.

Officer Olson corroborated Sergeant Brooks's testimony about calling into the unit management office prior to the move of the inmate. He called in to request escorts to assist

4

him with moving the inmate. But Officer Olson did not speak with Mr. Davis during the call, and he did not communicate with Mr. Davis after the move. When asked why he did not report the use of force to Mr. Davis after the move, Officer Olson explained that he assumed that the sergeant with the taser who Officer McDonald summoned for backup would make the report.

Based on the testimony, the Board found that Mr. Davis was not aware of the use of force during the inmate's transfer to the suicide-watch cell. It determined that the correctional officers involved in the move violated the use of force policy by not requesting and obtaining Mr. Davis's prior approval for the use of force. Although Officer McDonald testified that he requested authorization for the use of force from Mr. Davis and advised him of the use of force after the fact, the Board considered his credibility "highly questionable" because Officer McDonald had been previously disciplined for the excessive use of force. The Board reasoned that the desire to avoid disciplinary action would motivate both Officer Olson and Officer McDonald to make false claims about Mr. Davis's knowledge of the use of force. Officer McDonald would have extra motivation because additional discipline involving the use of force could lead to his termination.

Still, the Board determined that Mr. Davis violated state rules and regulations by engaging in conduct unbecoming of an employee in state service. *See* Tenn. Comp. R. & Regs. 1120-10-.03(11) (2019). It noted that Mr. Davis had maintained during the investigation that he was unaware of the specific details of the inmate's move and that he did not have any discussions with Officer McDonald before the move. The Board found that Mr. Davis's "deceptiveness and lack of candor hindered the investigation and undermined [his] credibility and ability as a leader in the TDOC system." But the Board concluded that termination was inappropriate because Mr. Davis was an employee of twenty-five years with no prior disciplinary actions. Instead, the Board ordered a one-step demotion. It also recommended that TDOC transfer him to another facility.

C.

Mr. Davis sought judicial review of the Board's decision in chancery court. He argued the Board's factual findings were inconsistent because of the adverse credibility determinations made against Officers McDonald and Olson. He also contended that the finding that he lacked candor or gave inconsistent statements in the investigation was not supported by substantial and material evidence. During the interview conducted as part of the investigation, Mr. Davis only conceded that he did not remember having discussions with Officer McDonald before the move and that it was possible such discussions could have taken place. And the Board exceeded its statutory authority when it recommended that TDOC transfer him.

The chancery court agreed that the Board's decision was not supported by substantial and material evidence and reinstated Mr. Davis to his previous position. The

court found that Mr. Davis's statements could be understood as being consistent. There were two different aspects of the inmate's transfer that "could potentially give rise to a faulty appearance of discrepancy in Mr. Davis'[s] statements and testimony." The first aspect was whether notification of the inmate move came before it occurred as per protocol. According to the court, the record reflected that Mr. Davis was consistent in his testimony that he was not informed of the inmate's move until after the fact, at approximately 2:00 p.m. The second aspect was the distinction between going on suicide watch and the actual move. Mr. Davis testified that he was aware that the inmate was "going on suicide watch at some point." But the court reasoned, "In a prison setting, knowledge that an inmate is going to go on suicide watch is different than being notified of the actual move prior to it occurring pursuant to suicide watch protocol."

As for his interview as part of the reopened investigation, the court noted that it was at a point after Mr. Davis became "emotionally distraught" that he stated that "it's possible" that he spoke with Officer McDonald before the inmate's move. But the investigative report added that Mr. Davis "said so much was going on, he didn't remember at first."

## II.

### A.

The Board's decision is "subject to judicial review in accordance with the Uniform Administrative Procedures Act." Tenn. Code Ann. § 8-30-318(j). Trial and appellate courts use the same standard of review. *Pressley*, 528 S.W.3d at 512. We will only reverse or modify the Board's decision

> if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5) (A) . . . [U]nsupported by evidence that is both substantial and material in the light of the entire record.

Tenn. Code Ann. § 4-5-322(h) (2021); *Pressley*, 528 S.W.3d at 512. "In determining the substantiality of the evidence, [we] take into account whatever in the record fairly detracts from its weight," but we do "not substitute [our] judgment for that of the agency as to the weight of the evidence on questions of fact." Tenn. Code Ann. § 4-5-322(h)(5)(A)(ii).

The substantial and material evidence standard "requires something less than a preponderance of the evidence, but more than a scintilla or glimmer." *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988) (citations omitted). The standard does not justify reversal simply because the evidence could support another result. *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001). Instead the decision should be upheld so long as the administrative record "furnishes a reasonably sound factual basis for the decision being reviewed." *City of Memphis v. Civ. Serv. Comm'n*, 216 S.W.3d 311, 317 (Tenn. 2007) (quoting *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 106, 111 (Tenn. Ct. App. 1993)).

On appeal, the Board contends that substantial and material evidence supports its final decision that Mr. Davis was deceptive and not candid in his interviews about the inmate transfer. We agree. Mr. Davis denied being aware of the move of the inmate before it occurred, claiming he was not informed until the afternoon. The second investigative report indicates that Mr. Davis initially denied informing Sergeant Brooks about the move of the inmate before it took place. Sergeant Brooks's testimony refuted that assertion. And after being confronted with the text messages, the investigative report reflects that Mr. Davis recanted his earlier statement and "then stated that he may have told Sgt. Brooks that [the inmate] was going to go on suicide watch."

Sergeant Brooks also testified that Mr. Davis was standing nearby when she took the call from Officer Olson about the move. At that point, according to Sergeant Brooks's testimony, Mr. Davis said, "I guess we're going to move [the inmate] from 204 to 101." She testified that Officer McDonald was in the doorway of the unit management office at the time.

In trying to bring some consistency to Mr. Davis's contradictory statements, the chancery court distinguished between the knowledge of an inmate going on suicide watch and the knowledge of the transfer of the inmate to a suicide-watch cell. But the testimony before the Board established that going on suicide watch meant that the inmate was moving to a cell where he could be watched and monitored. Mr. Davis's reaction to Officer Olson's call, which Sergeant Brooks recounted, indicates as much. Regular cells did not have video cameras in the cell. The suicide-watch cell permitted the necessary monitoring.

In addition to the testimony of Sergeant Brooks, there was also testimony regarding the open radio calls made by the officers carrying out the transfer of the inmate. The officers would have called to request the opening of the inmate's cell door and for additional assistance from the sergeant with the taser. As a unit manager, Mr. Davis would have had a radio on him. Yet, he maintained that he was unaware of the move until the afternoon.

Mr. Davis contends that the Board's decision was nevertheless arbitrary and capricious because the Board's findings of fact are contradictory. While this argument

7

overlaps with the question of whether the Board's decision is supported by substantial and material evidence, the inquiry is distinct. *See id.* at 317. "An arbitrary [or capricious] decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.* at 316 (alteration in original) (quoting *Jackson Mobilphone Co.*, 876 S.W.2d at 111).

Mr. Davis asserts that the Board acted arbitrarily and capriciously when it found both that he was not aware of the use of force by the officers and that he acted deceptively and lacked candor during the investigation. But these findings are not inconsistent. The Board reasonably could find that Mr. Davis did not know about the use of force during the inmate's transfer, yet acted deceptively during the subsequent investigation by not disclosing that he was aware that the transfer was taking place.

## B.

Mr. Davis raises his own issue on appeal concerning the Board's decision. He contends that the Board exceeded its statutory authority when it recommended that TDOC transfer him to another facility. The TEAM Act provides, "[i]f the employee is successful in obtaining reinstatement to a position from which the employee has been terminated, the employee shall be reinstated to a position in the county in which the employee was employed at the time of termination." Tenn. Code Ann. § 8-30-318(l).

But Mr. Davis was not "successful in obtaining reinstatement to a position from which [he was] terminated." *Id.* The Board vacated his termination but demoted him one rank, which was within its authority. *See Tenn. Dep't of Children's Servs. v. James*, No. M2019-00070-COA-R3-CV, 2020 WL 1492863, at *4 (Tenn. Ct. App. Mar. 25, 2020) ("[Tennessee Rules and Regulations 1120-11-.04] grants the Board the 'full authority to overturn, reduce, or amend the disciplinary action.'" (citation omitted)). So Mr. Davis was not entitled to reinstatement "to a position in the county in which [he] was employed." *See* Tenn. Code Ann. § 8-30-318(l).

## III.

Substantial and material evidence supports the Board's decision to demote Mr. Davis. And the Board acted within its statutory authority when it recommended his transfer to another facility. So we reverse the chancery court and affirm the decision of the Board.

s/ W. Neal McBrayer
W. NEAL MCBRAYER, JUDGE
