IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
NOVEMBER 29, 2006 Session

# JOHN RUFF v. JAMES G. NEELEY, Tennessee Commissioner of Labor and Workforce Development, and EPERFORMAX, INC.

Direct Appeal from the Chancery Court for Shelby County
No. CH-04-1206-1    Walter Evans, Chancellor

No. W2006-01192-COA-R3-CV - Filed December 20, 2006

This case involves a claim for unemployment benefits after an employee was terminated for failing to follow company policy and refusing to follow his supervisor's instructions. A female co-worker had previously complained about the claimant's repeated attempts to ask her out on dates and several occasions when he had followed her to her car, all of which had made her uncomfortable. The claimant was suspended for two days at that time. A few months later, another female co-worker complained to her supervisor about the claimant's behavior after he continued asking her out on dates for over a month, waited for her at her car, and eventually hugged her at work after she rejected another invitation to go out with him. A meeting was held about the claimant's conduct, and his female co-worker and his supervisors asked that he agree not to communicate with the co-worker in the future. The claimant would not agree to stop contacting his co-worker, and he was terminated from his employment the next day. He filed for unemployment benefits, which were initially approved by the Department of Labor. On appeal, the Appeals Tribunal found that the claimant was disqualified from receiving benefits because he had been terminated for work related misconduct. The finding was affirmed by the Board of Review, and later by the chancery court. For the following reasons, we affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

John Ruff, Memphis, TN, *pro se*

Paul G. Summers, Attorney General & Reporter, Lauren S. Lamberth, Assistant Attorney General, Nashville, TN, for Appellee James G. Neeley

Eugene Stone Forrester, Jr., Memphis, TN, for Appellee Eperformax, Inc.

## MEMORANDUM OPINION[1]

### I.  FACTS & PROCEDURAL HISTORY

John Ruff began working as a "Marketing Associate," or telephone representative, for ePerformax, Inc., on January 8, 2003.  ePerformax is a third-party call center that provides sales and customer service for other companies.  When he was hired, Mr. Ruff signed a "Professionalism Policy" specifically prohibiting sexual harassment of any kind.  He also signed an "Employee Handbook Receipt" stating that he had reviewed ePerformax's Employee Handbook and agreed to abide by its guidelines.[2]  Section 1 of the Handbook provides, in pertinent part, that:

> An employee may be dismissed for any reason, at any time, including (but not limited to) . . . violation of policy, . . . insubordination, . . . misbehavior or misconduct.  ePerformax will not allow any form of harassment or any such conduct that has the purpose or effect of interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment; ePerformax may dismiss an employee for such conduct.
>
> . . .
>
> All employees are asked to be sensitive to the individual rights of their co-workers.
>
> . . .
>
> Sexual harassment, as defined by this policy, includes, but is not limited to, sexual advances, verbal or physical conduct of a sexual nature (sexual related comments/uninvited touching), visual forms of a sexual nature (i.e., signs, posters, and the like), or requests for sexual favors.

---

[1]  Tenn. R. Ct. App. 10 states:
> This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

[2]  Mr. Ruff claims he never received a copy of the Employee Handbook, but the "Handbook Receipt" he signed states otherwise.  Also, according to the Receipt, Mr. Ruff understood that any of the information in the Handbook could be found on a computer just outside the call center and he was free to access the information at any time.

. . .

> Sexual harassment is considered to be a major violation of company policy and (depending upon the severity of the violation) will result in disciplinary action including termination of employment.

It is undisputed that Mr. Ruff's job performance as it relates to his duties at ePerformax was never an issue.

In May of 2003, Ms. Robin Pennington, one of Mr. Ruff's female co-workers, expressed her concern about Mr. Ruff to ePerformax's Human Resources Department. Ms. Kelly Legett, the Human Resources Director, held a meeting with Ms. Pennington to discuss the situation. Ms. Pennington explained that she felt uncomfortable because Mr. Ruff repeatedly asked her out on dates, sometimes two or three times per day. Mr. Ruff had followed her to her car at the end of shifts about six or seven times, asking to speak to her privately or asking her out on dates. Ms. Pennington kept telling Mr. Ruff that she did not want to date him, but Mr. Ruff had been asking her out for about a month and a half. On one occasion, Ms. Pennington told Mr. Ruff that she was dating someone else, and Mr. Ruff became angry with her. Ms. Pennington signed a written statement describing these events on May 2, 2003.

Ms. Kathleen Gordon, another female co-worker, had witnessed Mr. Ruff's advances toward Ms. Pennington. She also spoke with Ms. Legett about Mr. Ruff's behavior and stated that he had frequently followed Ms. Gordon and Ms. Pennington to breaks and when leaving for the day. Ms. Gordon had often heard Ms. Pennington tell Mr. Ruff that she was not interested in dating him. Ms. Gordon also explained that Mr. Ruff had given Ms. Pennington a birthday card the day before with his telephone number written inside it and a note asking if she was interested in dating him. She said the card made Ms. Pennington upset, and she thought Mr. Ruff would continue to approach Ms. Pennington. Ms. Gordon noted that Mr. Ruff also made her uncomfortable, and she feared that he would approach them if he found out they had spoken to management about him.

On May 5, 2003, Mr. Ruff was called to a meeting to discuss the situation with Ms. Legett, the Human Resources Director, and Ms. Phaedra Page, the Call Center Manager. Mr. Ruff acknowledged that he had asked Ms. Pennington out on several occasions, but he felt she did not make it clear that she did not want to date him. ePerformax suspended Mr. Ruff for two days based on these incidents. A written memo was prepared about the incident which stated, in relevant part:

> Going forward, [Mr. Ruff] must not approach Robin Pennington or have any further contact to avoid creating further discomfort. He should refrain from similar behavior or any other behavior that could create an uncomfortable environment.

. . .

> Further similar behavior, failure to follow the directives outlined
> above, or violation of any other ePerformax policy or practice will
> result in further corrective action, up to and including termination of
> employment.

Mr. Ruff refused to sign the memo, and after discussing the memo with the Vice President of Human Resources, Ms. Rita Van Vranken, he claimed that she told him he did not have to sign it. There were no further complaints by Ms. Pennington and it appears that she either quit working at ePerformax or was terminated in August of 2003.

In November of 2003, Mr. Ruff began to express an interest in Ms. Eloise Worship, another female co-worker. Mr. Ruff had begun sitting beside her and asking her to lunch and to other places, and Ms. Worship had consistently refused. He would approach her in the break room and advise her of the types of food she should buy from the vending machine,[3] and he left notes, candy and fruit on her desk. Mr. Ruff had also been waiting for her at her car in the parking lot, and he appeared at places where she would go after work such as the grocery and the mechanic's shop. Ms. Worship felt that Mr. Ruff was eavesdropping on her private conversations at work. On December 1, Mr. Ruff asked Ms. Worship to join him for a cup of tea, and she refused. According to Ms. Worship, Mr. Ruff proceeded to hug her and that made her very uncomfortable. She immediately complained to her supervisor, Mr. Tommy Crawford, about Mr. Ruff's behavior. She explained that she wanted to meet with Mr. Ruff to ask him to stop approaching her, but she wanted management personnel to be present.

On that same day, a meeting was held involving Mr. Ruff, Ms. Worship, Ms. Legett, and Mr. Crawford. Ms. Worship explained how his specific behaviors had made her uncomfortable, and she requested that he not ask her out or leave things on her desk. Mr. Ruff acknowledged that he had "picked up on her discomfort," but he still thought she could have been attracted to him. Ms. Worship asked if he would commit to only having a working relationship with her, and he would not agree to such a commitment. Finally, she asked him not to even speak to her anymore, and Ms. Worship was allowed to leave the meeting.

Ms. Legett then emphasized to Mr. Ruff the importance of stopping certain behaviors when he is told "no" or is advised that he is making other employees uncomfortable. She also discouraged his touching of co-workers beyond a professional handshake. Mr. Ruff offered to demonstrate how he had "hugged" Ms. Worship on Mr. Crawford, but Mr. Crawford said "no, no" and waved him away. Mr. Ruff proceeded to hug Mr. Crawford anyway, and according to Ms. Legett and Mr. Crawford, Mr. Ruff stated that he had the right to hug someone if he wanted to. Ms. Legett and Mr. Crawford again asked Mr. Ruff to agree not to contact Ms. Worship again. When Mr. Ruff would not give them a commitment, he was sent home for the day. Mr. Ruff was terminated the next day via telephone. Mr. Ruff wrote letters regarding his termination to Ms. Van Vranken, the Human

---

[3] During the May 2003 incident, Ms. Pennington had also complained about Mr. Ruff saying things like, "Jesus would want you to stop eating meat."

Resources Vice President. She responded with a letter explaining that she had reviewed the facts and documentation, and that his termination was fair and consistent with ePerformax's policies.

On December 8, 2003, Mr. Ruff filed a claim with the Department of Labor and Workforce Development ("the Agency") for unemployment benefits. When filing his claim, Mr. Ruff explained that ePerformax had discharged him for violating its sexual harassment policy, but he did not think his actions constituted sexual harassment. He also noted that the "[p]ersonnel director made me aware of sexual harassment in May 2003 when I gave an employee a birthday card." The Department of Labor issued an "Agency Decision" on December 30, 2003, approving benefits for Mr. Ruff because there was insufficient evidence of work-related misconduct to disqualify him from receiving benefits. ePerformax appealed the Agency Decision and requested an in-person hearing before the Appeals Tribunal.

Mr. Ruff requested that the Appeals Tribunal subpoena three witnesses to testify at the hearing – Ms. Worship, Ms. Legett, and Ms. Van Vranken. However, Mr. Ruff subsequently wrote to the Appeals Tribunal withdrawing *his* request for an in-person hearing. Nevertheless, a hearing was held before the Appeals Tribunal on February 10, 2004, and Ms. Worship, Ms. Legett, Mr. Crawford, and Mr. Ruff all testified. Ms. Van Vranken did not testify at the hearing, and Mr. Ruff's request for her to be subpoenaed is marked "no first knowledge. only involved in [employer] internal process." The Appeals Hearing Officer heard extensive testimony from the witnesses, and the hearing lasted more than twice as long as most hearings before the Appeals Tribunal. On February 11, 2004, the Appeals Tribunal issued its decision with the following findings:

> FINDINGS OF FACT: Claimant's most recent employment prior to filing this claim was with E Performax as a marketing associate between January 2003 and December 2003. Claimant was discharged after he refused to follow management's instructions not to communicate with, harass or continue to try to socialize with a fellow co-worker. Employer met with claimant for two hours December 1, 2003 and discussed his behaviors during the month of November 2003. The meeting involved management, claimant and a co-worker who asked claimant to stop asking her out because she was not interested in him. Claimant had often tried to have personal conversation with her as well as ask her out. Claimant would leave candy, fruit and notes for her. On one occasion he waited for her near her car and on two occasions she has seen him at locations away from the job site and she felt he was following her. Claimant [sic] had asked that he stop asking her out stating she was not the person for him. The final incident was when he asked her out for tea one afternoon when there was a break in the work day. She rejected this offer and he proceeded to hug her without her permission. Claimant also told her just to let him know when she would go have tea with him. Claimant [sic] stated she was not interested in him. Co-worker

reported the situation to management because she felt claimant was not listening to her and accepting no for her answer. A meeting was called with employer and claimant to address co-workers complaints. Employer noted in the meeting that there had been a previous warning to claimant in May 2003 after another employee made a complaint about claimant and him being persistent asking her out. Claimant was warned then and reminded of the workplace harassment policy which addressed creating a hostile work place. Claimant refused to sign the warning and he protested the warning but the warning was not rescinded despite his requests to upper management. After a two hours meeting, the human resources director asked claimant if he was going to comply with her requests not to communicate or ask out his co-worker. Employer wanted assurances he would no longer create a hostile work environment for her but claimant stated no he could not guarantee employer. Claimant felt employer was interfering with his rights to ask someone out and interfering with his right to find a wife and/or to date someone. Claimant was suspended for the day and terminated the following day for violating the company harassment policy and for failing to follow instructions from management as it relates to his behaviors with his co-workers.

CONCLUSIONS OF LAW: The claimant is disqualified from receiving benefits. The issue is whether claimant is guilty of work connected misconduct under TCA § 50-7-303. Misconduct is an intentional act or a violation of policy that breaches the standards of behavior an employer has a right to expect. Claimants are eligible for unemployment insurance benefits when they have been separated due to no fault of their own. In this case, claimant disregarded employer's best interests when he failed to comply with the company sexual harassment policy and he failed to obey reasonable instructions from employer. Claimant had been warned about similar behavior just a few months earlier when employer instructed him not to harass or create a hostile work environment for employees. Claimant was pursuing a relationship with a co-worker who continued to say no. After being warned, a second co-worker communicated to claimant that she was not interested in him but he persisted to ask her out and he left her gifts and notes as well as meeting her at her car even hugging her when it was not welcomed, creating a hostile work environment. Claimant was asked by the co-worker to move on because she was not interested but he did not comply. Claimant then refused to obey instructions by management who warned him once again to stop harassing his female co-worker. Claimant admits to his actions and he admits he refused to comply with employer's

instructions. The Tribunal finds his actions rise to misconduct and they do violate the company sexual harassment policy as well as reasonable instructions from management. Employer had just cause to release claimant under these conditions.

DECISION: The Agency Decision is reversed. The claimant is not eligible for unemployment benefits under TCA § 50-7-303(a)(2). The claim is denied as of the date of filing. Any payments received by the claimant under this claim are an overpayment and must be refunded to the Agency.

Mr. Ruff subsequently sent to the Appeals Tribunal a "Request for Reconsideration & to Amend Findings of Fact" along with a "Request for Appeals Tribunal to Issue Witness Subpoenas." He asked the Appeals Tribunal to subpoena Ms. Pennington and Ms. Van Vranken, as well as other co-workers including Ms. Gordon, Joyce McCree and Maynard Anthony. In addition, he requested that Ms. Worship and Mr. Crawford be subpoenaed to testify again before the Appeals Tribunal.

Mr. Ruff then requested an additional hearing before the Agency's second appellate level, the Board of Review. He asked that Ms. Worship and Mr. Crawford be subpoenaed so that he could question them further, and he also requested that Ms. Pennington be subpoenaed. The Board did not hold an additional hearing on Mr. Ruff's claim, and it affirmed the Appeals Tribunal's finding based on the existing record. Mr. Ruff filed a Petition to Rehear, which was denied.

Mr. Ruff then filed a Petition for Judicial Review in the Chancery Court of Shelby County. The trial court found substantial and material evidence to support the Agency's finding that Mr. Ruff had engaged in disqualifying misconduct. Therefore, the Board of Review's decision was affirmed, and Mr. Ruff's petition was dismissed. Mr. Ruff filed his notice of appeal to this Court on May 31, 2006.

## II. ISSUES PRESENTED

Appellant has timely filed his notice of appeal and presents the following issues, as we perceive them, for our review:

1.      Whether substantial and material evidence exists to support the conclusions of the agency and the chancellor that claimant violated ePerformax's sexual harassment policy;
2.      Whether the chancellor failed to consider the entire record in violation of T.C.A. § 50-7-304(i)(2)(D)–(E);
3.      Whether defendants carried their burden of proof in disqualifying claimant from receiving benefits;
4.      Whether the Appeals Tribunal erred in allowing ePerformax's May 5, 2003 memorandum to stand as a "prior warning" for termination purposes;

5. Whether claimant owed a duty to ePerformax to enter into a proposed agreement to stop associating with female co-workers Pennington and Worship;
6. Whether the chancellor's decision affirming the Board of Review was arbitrary and capricious;
7. Whether the agency's decision was legally insufficient because there was no statutory finding of "misconduct connected with work";
8. Whether the Board of Review and Appeals Tribunal violated claimant's Constitutional rights by denying some of his requests for witness subpoenas and for an additional hearing;
9. Whether the Appeals Tribunal denied claimant a fair hearing;

For the following reasons, we affirm the decision of the chancery court.

## III. STANDARD OF REVIEW

This Court reviews administrative unemployment compensation decisions using the same standard employed by trial courts. *Ford v. Traughber*, 813 S.W.2d 141, 144 (Tenn. Ct. App. 1991); *Armstrong v. Neel*, 725 S.W.2d 953, 955 (Tenn. Ct. App. 1986). It is statutorily defined and set forth in Tenn. Code Ann. § 50-7-304(i) (2005):

> (2) The chancellor may affirm the decision of the board or the chancellor may reverse, remand or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
> (A) In violation of constitutional or statutory provisions;
> (B) In excess of the statutory authority of the agency;
> (C) Made upon unlawful procedure;
> (D) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (E) Unsupported by evidence that is both substantial and material in the light of the entire record.

The standard is more narrow than the broad standard employed in other civil appeals. *Wayne County v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988). We defer to the decisions of administrative agencies when they are acting within their area of specialized knowledge, experience, and expertise. *Id.*

## IV. DISCUSSION

We believe Mr. Ruff's assignments of error can be summarized by addressing two main issues: whether the Agency's decision was arbitrary and capricious or unsupported by substantial and material evidence; and whether he was denied a fair hearing because all of his requests for subpoenas were not granted.

## A.    Review of the Agency's Decision

When the evidentiary basis of a decision involving an unemployment compensation claim is attacked, courts must review the entire record, including any proof that fairly detracts from the agency's decision, to determine whether it is arbitrary, capricious, characterized by an abuse of discretion, or unsupported by substantial and material evidence. *Armstrong v. Neel*, 725 S.W.2d 953, 955 (Tenn. Ct. App. 1986) (citing Tenn. Code Ann. § 50-7-304(i)(2)(D), (E)). An agency's decision is arbitrary if it lacks any rational basis. *MobileComm of Tenn., Inc. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 101, 104 (Tenn. Ct. App.1993). "Substantial and material evidence" means "relevant evidence which a reasonable mind might accept to support a rational conclusion and which furnishes a reasonably sound basis for the action being reviewed." *Armstrong*, 725 S.W.2d at 955 (citing *Southern Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984); *Pace v. Garbage Disposal Dist. of Washington County*, 54 Tenn. App. 263, 267, 390 S.W.2d 461, 463 (1965)). Where the facts are virtually undisputed, the question of whether the employee's actions constituted "misconduct" under the statute is a question of law that we review *de novo*. Tenn. R. App. P. 13(d) (2006); *Hallowell v. Vestco, Inc.*, No. W2004-01322-COA-R3-CV, slip op. at 7 (Tenn. Ct. App. W.S. May 4, 2005).

Tenn. Code Ann. § 50-7-303(a)(2) provides that a claimant shall be disqualified from receiving benefits if the administrator finds that the claimant was discharged from his employment for "misconduct connected with such claimant's work". In order to establish a disqualification under this statute, an employer must show that its employee materially breached a duty which the employee owed to the employer. *Trice v. Traughber*, 797 S.W.2d 886, 887 (Tenn. 1990). Unless the employee's wrongdoing violated such a duty, it cannot amount to "misconduct *connected with his work*." *Id.* (citing *Weaver v. Wallace*, 565 S.W.2d 867, 870 (Tenn. 1978)).

The statute does not define "misconduct connected with work," so its meaning has been developed on a case by case basis. *Armstrong*, 725 S.W.2d at 956. Actions that are not deemed to be "misconduct" within the meaning of the statute include: mere inefficiency, unsatisfactory conduct, failure to perform as the result of inability or incapacity, inadvertence or ordinary negligence in isolated instances, or good faith errors in judgment. *Id.* (citing *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 296 N.W. 636, 640 (1941)). Generally, "misconduct connected with work" has been described as:

> conduct evincing such wilful and wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, . . . or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to the employer.

*Id.* This Court has previously stated that an employee's refusal to follow the lawful requests of a supervisor is the "classic example" of a deliberate violation or disregard of standards of behavior which an employer has the right to expect of his employee. *Hallowell v. Vestco, Inc.*, No. W2004-01322-COA-R3-CV, slip op. at 7 (Tenn. Ct. App. W.S. May 4, 2005) (citing *Russell v. Culpepper*, 1997 WL 129110, at *3 (Tenn. Ct. App. March 21, 1997). When an employee refuses a supervisor's lawful request, that employee has engaged in misconduct connected with his work within the meaning of Tenn. Code Ann. § 50-7-303(a)(2). *Id.* The legislature has rationally determined that an employee who intentionally refuses to carry out orders is excluded from the government protection of unemployment benefits. *Id.*

After reviewing the entire record, we find substantial and material evidence to support the factual findings of the Appeals Tribunal, Board of Review, and the trial court. In addition, their legal conclusions have a reasonable basis in the law and were not arbitrary or capricious. It is undisputed that Mr. Ruff was made aware of ePerformax's sexual harassment policy in May of 2003 when Ms. Pennington complained about his behavior. At that point, two female co-workers had communicated to the Human Resources Department that Mr. Ruff's behavior made them feel uncomfortable. Although Mr. Ruff disputes the effect of the written memo prepared after the meeting because he refused to sign it, he acknowledged that the memo had never been formally rescinded. Also, his two-day suspension from work certainly made him aware that ePerformax was serious about enforcing its policy. In November of the same year, Mr. Ruff began to ask out another co-worker even after he had "picked up on her discomfort." She felt it was necessary to have management present when she firmly asked him not to ask her out anymore or leave things at her desk. Despite her efforts, Mr. Ruff would not agree to stop communicating with her. Mr. Ruff was then asked by his supervisor and the Human Resources Director to agree not to contact Ms. Worship again, and Mr. Ruff would not give them such a commitment. Mr. Ruff's course of conduct had persisted for over a month, he had created an offensive work environment for his co-workers, and ePerformax had reason to believe that Mr. Ruff would continue to disturb Ms. Worship at work. This type of behavior clearly demonstrates a "wilful and wanton disregard of an employer's interests" as a "deliberate violation[] or disregard of standards of behavior which the employer has the right to expect of his employee." *See Armstrong*, 725 S.W.2d at 956. As such, we agree with the finding that Mr. Ruff was terminated for "misconduct connected with work" and thereby disqualified from receiving unemployment benefits. *See* Tenn. Code Ann. § 50-7-303(a)(2) (2005).

### B. Mr. Ruff's Requests for Issuance of Subpoenas

Mr. Ruff also challenges the Agency's decision not to issue subpoenas for all of the witnesses he had requested prior to his hearing. Before Mr. Ruff's hearing at the Appeals Tribunal stage, he requested that three subpoenas be issued: for Ms. Worship, Ms. Kelly Legett, and for Ms. Rita Van Vranken. The only witness Mr. Ruff had requested who did not testify was Ms. Van Vranken. A regulation governing the Department of Labor's appeal stages provides that "[t]he Chief of the Appeals Tribunal and the Special Master or Chairperson of the Board of Review shall issue subpoenas for witnesses . . . upon written request by the claimant or the employer." Tenn. Comp.

R. & Regs. 0560-3-4-.04(1) (2006).  However, this right is not absolute.  The regulation goes on to state that:

> (4) The right to subpoena witnesses . . . shall be subject to the limitation that no subpoena shall be issued if the Chief of the Appeals Tribunal or Chairman of the Board of Review finds, on the basis of specific facts, that issuance of the subpoena would result in an abusive and oppressive imposition, or would delay the proceedings unnecessarily.
>
> (a) In determining whether a subpoena is abusive, oppressive, or would delay the proceedings unnecessarily, the Chief of the Appeals Tribunal or Chairperson of the Board of Review shall consider:
> 1. the relevance of the expected testimony to the case, and
> 2. the proximity of the prospective witness's information to the issues at stake, and
> 3. the possible duplication of testimony among witnesses, and
> 4. any other factors which are material to the case.
>
> (b) If a subpoena is denied, an offer of proof may be made at the hearing concerning the evidence sought. If, after hearing the available evidence, the hearing officer determines that the proposed evidence could materially affect the outcome of the case, the hearing officer shall continue the hearing for the purpose of issuing the subpoena.

Tenn. Comp. R. & Regs. 0560-3-4-.04(4) (2006).  After reading this regulation in its entirety, it is clear that a claimant's request for a subpoena to be issued may be denied for certain reasons.  Mr. Ruff's request for Ms. Van Vranken to be subpoenaed was marked by the Agency: "no first knowledge.  only involved in [employer] internal process."  Ms. Legett was the Human Resources Director who attended the meetings with Mr. Ruff, and Ms. Van Vranken was the Vice President of Human Resources to whom he had written letters disputing his suspension and termination.  The relevant regulation gives the Appeals Tribunal discretion to deny a subpoena upon a finding that the witness's testimony would delay the proceedings unnecessarily, and it appears that the Tribunal concluded that Ms. Legett's testimony about the events would be sufficient.  Mr. Ruff did not have an absolute right to subpoena Ms. Van Vranken, and we find no error in the Appeals Tribunal's decision not to issue the subpoena.

Mr. Ruff had also requested that subpoenas be issued when he filed his "Request for Reconsideration" with the Appeals Tribunal and when he requested an additional hearing with the Board of Review.  The previously-mentioned regulation does provide that the Board of Review's Chairperson "shall" issue subpoenas upon request, with certain limitations.  However, there is also a statute which appears to clarify that the Board need not hold an additional hearing in every case.  Tenn. Code Ann. § 50-7-304(e)(1) states that, in reviewing a claim, the Board of Review may

proceed "on the basis of the evidence previously submitted in such case, or direct the taking of additional evidence . . . ." Again, we do not believe that Mr. Ruff had an absolute right to subpoena witnesses at this stage of the proceedings.

In any event, we find that any alleged error by the Board in not issuing the subpoenas would be harmless. "No decision of the board shall be reversed, remanded or modified by the chancellor, unless for errors that affect the merits of the final decision of the board." Tenn. Code Ann. § 50-7-304 (i)(3) (2005). Ms. Worship, Ms. Legett, Mr. Crawford and Mr. Ruff had testified at length about the incidents leading to Mr. Ruff's termination. For the most part, the facts were undisputed and Mr. Ruff only debated the characterization of his actions as harassing Ms. Worship. He testified about his discussions with Ms. Van Vranken and the letters of correspondence between them were included in the record. In sum, we cannot say that the Agency's failure to subpoena the other witnesses more probably than not affected the outcome of the case, and thus, any potential error was harmless. *See* Tenn. Code Ann. § 50-7-304 (i)(3) (2005); Tenn. R. App. P. 36(b) (2006); ***Elliott v. Neeley***, No. E2004-00203-COA-R3-CV, slip op. at 5 (Tenn. Ct. App. E.S. Feb. 22, 2005) (Board of Review's failure to reschedule a hearing when a witness did not appear was harmless error when claimant testified as to what missing witness would have stated).

## V.  CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to Appellant, John Ruff, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE

-12-