IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 18, 2012 Session

DANIEL A. RILEY, C.N.A. v. JOHN DREYZEHNER, M.D., M.P.H., IN HIS
OFFICIAL CAPACITY AS COMMISSIONER OF THE TENNESSEE DEPARTMENT OF
HEALTH

Direct Appeal from the Chancery Court for Davidson County
No. 10-440-III     Ellen H. Lyle, Chancellor

No. M2012-00695-COA-R3-CV - Filed October 19, 2012

Appellant nurse assistant's name was placed on the Abuse Registry after the Appellee Tennessee Department of Health concluded that he had committed an act of abuse on an elderly person in his care at a nursing home. Appellant appeals, arguing that substantial and material evidence does not exist to show that he committed an act of abuse on the nursing home resident. Having determined that substantial and material evidence in the record supports the decision of the Tennessee Department of Health, we affirm.

Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Frank J. Scanlon, Nashville, Tennessee, for the appellant, Daniel A. Riley.

Robert E. Cooper, Jr., Attorney General and Reporter; Sara E. Sedgwick, Senior Counsel, for the appellee, John Dreyzehner, M.D., M.P.H., Commissioner, Tennessee Department of Health.

OPINION

I. Background

On August 29, 2008, the Appellee Tennessee Department of Health ("the Department") issued a Notice of Charges against Appellant Daniel A. Riley. The notice of

charges alleged that Mr. Riley had abused a seventy-year old female patient ("the resident")[1] at Lakeshore Hartland Nursing Home ("the facility"), where Mr. Riley worked as a certified nurse assistant. Specifically, the notice of charges alleged that:

> While [Mr. Riley] was in the room of the resident [] and they were conversing, he placed his hand on her groin area. [Mr. Riley] was not providing perineal care or toileting services to [the resident] when this occurred, nor was he getting her ready for bed. . . . [The resident] stated he touched her inappropriately on two (2) or (3) occasions. . . . [The resident] asked that [Mr. Riley] not be assigned to care for her any longer because she feared him. . . . The facility conducted an investigation following the report of the incident. As a result, [Mr. Riley's] employment was terminated on December 18, 2007.

The Notice of Charges further stated that the Department sought to have Mr. Riley's name placed on the Abuse Registry pursuant to Tennessee Code Annotated Section 68-11-1001 *et. seq*.

A contested case hearing was held before an administrative law judge on October 28, 2008. Mr. Riley appeared *pro se*. At the hearing, Melissa Kirkham, the certified nurse assistant who first learned of the alleged incident, testified first. Specifically, Ms. Kirkham testified that, on the night of December 7, 2009:

> I came into the room, [and] I asked her how she was. She seemed upset, so I asked her what was the matter. And she stated, He's not coming in here, is he?
>> And I, of course, questioned who.
>> She said, That man.
>> I, of course, elaborated further, What man?
>> And she said, That black man.
>> And . . . with me working nights, I only know of so many techs[2] that are male and happened to be black. So I asked her, I said, Was it a tech?
>> And she said, Yes.
>> I said, You know—and I used [Mr. Riley's] name. I said,

---

[1] The resident's name was stricken from the record to protect her privacy.

[2] Nurse assistants are referred to as "techs" by those that work in the facility.

[Mr. Riley]?
And she said , Yes, that black man.

Ms. Kirham further testified that the resident explained why she did not want Mr. Riley coming into her room, stating:

> She basically said that she did not want him to touch her again. And, you know, she's like, I don't want him coming back in here. He touched me. . . . She said, He touched me down there.

Ms. Kirkham testified that, as the resident made this statement, "she placed her hand over her private parts." According to Ms. Kirkham, she then asked the resident: "Are you sure he wasn't coming to check you to see if you were wet or needed to be changed?" The resident replied that he had not, as she had not been wearing an adult diaper at that time. Ms. Kirkham further testified that, when she asked if the resident was sure he was not touching her for proper purposes, the resident began to cry and repeated that she did not want the man back in her room. Ms. Kirkam then testified that she reported the incident to her superior.

On cross-examination, Ms. Kirkham admitted that she and Mr. Riley had several disputes prior to this incident and that she had made numerous complaints against him to nursing home officials, alleging that he had sexually harassed her. Specifically, Ms. Kirkham testified to one incident in which she alleged that Mr. Riley attempted to pull her into a resident's room to watch a pornographic video while the resident was sleeping. Ms. Kirkham also testified that Mr. Riley has a temper and made inappropriate sexual comments and advances toward her. Ms. Kirkham testified that she always reported the incidents to her supervisor; however, to her knowledge, nothing was done about the alleged harassment. Ms. Kirkham even testified that she threatened to quit if her allegations against Mr. Riley were not taken more seriously. Soon after, Mr. Riley was suspended for the incident at issue in this case. In addition, Ms. Kirkham admitted that other African-American men work in the facility. Upon questioning from the court, Ms. Kirkham testified that it was possible that other African-American male nurse assistants might have worked with the resident, but she doubted that the resident would know any of their names, unlike with Mr. Riley. Ms. Kirkham also admitted to an incident where she had falsely claimed to be at work at the facility, when, in fact, she had not been present.

Several other facility personnel spoke with the resident about the incident during the course of the investigation that followed Ms. Kirkham's report. One such person was Cassandra Driver, the Director of Social Services and Grievance Coordinator at the facility. Ms. Driver is also a certified counselor. Ms. Driver testified that she spoke with the resident on December 12, 2007, after being directed to do so by the facility administrators. When

asked how the staff was treating her, the resident initially responded positively. However when pressed, the resident did admit that a male staff member had "touched her in a bad place." When Ms. Driver asked the resident where the staff member had touched her, the resident stated "where my hand is" and indicated her groin area. Ms. Driver also testified that the resident was scared and afraid she would "get in trouble" for reporting the incident. According to Ms. Driver, the resident stated that she was not scared of being in her room "as long as she knew that he wasn't going to be coming back in." Ms. Driver also did a mini mental evaluation of the resident. The evaluation showed that the resident's short term memory was impaired, but that she was generally time and place oriented.

On cross-examination, Ms. Driver testified that it was the nurse assistant's duty to make sure that the residents were not wet and that they could be reprimanded if they left a patient unattended. With regard to whether there were any other male nurse assistants on the floor on the night of the incident, Ms. Driver stated that "At the time I was aware that [Mr. Riley] w[as] the only one on that floor. I know that we do have other male techs that come in on the day shift and the night shift between the two floors." When pressed as to whether other African-American male nurse assistants were working on the resident's floor around the time of the incident, Ms. Driver stated:

> I know we have one African American male tech that primarily works [another floor], but will pick up extra shifts on [the resident's floor]. But I don't remember when that started, if he was doing it December of [2007] or if that's more of this year. But, yes, the other males that we have working are African-American.

Jo Ann Parks, the facility's Director of Nursing, also spoke with the resident regarding the alleged incident. Nurse Parks had a meeting in her office with the resident to discuss the allegations. Also present was Victoria McGuire, the Assistant Director of Nursing at the facility. Nurse McGuire referred the resident's allegations to Nurse Parks after having been informed of the accusations by Ms. Kirkham's supervisor. According to Nurse Parks, the resident was tearful and recounted "almost exactly the same thing that had been reported to me by [Ms. McGuire]." According to Nurse Parks, the resident told her that she was "afraid of the man who took care of her at night." Nurse Parks testified that she knew that the resident was referring to Mr. Riley because he was the only African-American nurse assistant on the resident's floor. Nurse Parks further testified that, when asked why she was afraid, the resident stated that the man touches her and "put her hand on her vaginal area and indicated that's where." The resident indicated that the abuse had occurred more than once. When asked whether the man had done so for a legitimate medical purpose, such as to check if she was wet, the resident stated, "I don't know why he was doing that because we were talking

-4-

about Santa Claus."

Nurse Parks further testified that she and Nurse McGuire typed up a statement after the resident recounted her allegations. Both Nurse Parks, Nurse McGuire, and the resident read and signed the written statement, which was admitted into evidence without objection. The statement recounted essentially the same facts as contained in Nurse Parks' testimony.

Nurse Parks also testified about the resident's physical condition both when she was admitted to the facility, and at the time of the administrative hearing. According to Nurse Parks, at the time the resident was admitted to the facility, she was undergoing treatments to her spine due to a recent back surgery. Although the resident was able to go to the bathroom, she required assistance to get in and out of bed. In addition, the resident was undergoing pain management. However, by the time of trial, the resident's physical and cognitive condition had deteriorated; thus, the resident required more assistance with her daily care. Nurse Parks clarified, however, that, at the time of the incident, the resident was able to accurately recall events that had happened.

When questioned on cross-examination, Nurse Parks testified that she was aware of various staff members' complaints regarding allegations of sexual harassment against Mr. Riley. Nurse Parks stated, however, that, when she investigated the complaints, the staff members stated that they wanted the administration to know of his behavior, but that they did not want to pursue a formal investigation into Mr. Riley. Nurse Parks stated that she was not specifically aware of any complaints by Ms. Kirkham.

Nurse McGuire also testified regarding the interview with the resident. According to Nurse McGuire, she read the written statement to the resident and asked her to sign. Nurse McGuire testified that it was her belief that the resident understood what she was signing because the resident expressed some trepidation about getting into trouble for signing it, which concern Nurse McGuire noted on the statement. After this interview, the facility staff called in the resident's family to report the incident. Although the family members stated that the resident had not voiced these accusations to them, they did state that the resident was afraid to be left alone at night because she was scared. Nurse McGuire further testified that Mr. Riley was called into the administrative office and was placed on suspension. According to Nurse McGuire, Mr. Riley did not admit the allegations, but also did not deny them. Mr. Riley's employment with the facility was subsequently terminated. When questioned as to whether Nurse McGuire believed the resident's accusation, Nurse McGuire replied that she did because the resident had told essentially the same story throughout the investigation.

On cross-examination, Nurse McGuire did admit that another staff member had previously made an allegation that Mr. Riley was abusing a resident, as well as a number of

other allegations, but that the allegations were not substantiated. Nurse McGuire also admitted that she was not aware of any complaints from Ms. Kirkham against Mr. Riley and that, if complaints had been made, she would have expected to have heard of them. Nurse McGuire finally testified that usually two male nurse assistants were not assigned to the same floor at the same time. In addition, Nurse McGuire testified that Mr. Riley worked a considerable amount of overtime, which often resulted in his working seven nights a week.

Finally, Mr. Riley testified regarding an incident where the resident demanded to see his license, which Mr. Riley testified he reported to his supervisor.[3] Mr. Riley testified that he often tried to check whether the resident was wet, and that she often resisted, arguing that she was not wet. However, according to Mr. Riley, once he explained that he was supposed to check, the resident acquiesced. Mr. Riley further testified that he must check to make sure the patients are not wet because he has falsely been reprimanded for leaving patients wet. Mr. Riley testified that he had never inappropriately touched the resident or any other resident of the facility. Mr. Riley did admit, however, that he worked the night shift on the resident's floor with one other nurse assistant, usually a woman. Mr. Riley further testified that all of the allegations against him have stemmed from his being of African descent[4] and that Ms. Kirkham has made racially charged comments to him. However, Mr. Riley admitted that he was not aware of any problems with current staff members who were African-American, and stated that the turnover rate for African-Americans is not higher than for other staff members.

The administrative law judge issued an initial written order on February 2, 2009. The administrative law judge entered a corrected order on February 6, 2009. In the corrected order, the judge found that the Department had proven, by a preponderance of the evidence, that the resident is a vulnerable person and that Mr. Riley committed an act of abuse against a vulnerable person. Thus, the judge ordered that Mr. Riley's name be added to the abuse registry. Specifically, the order stated:

> After much deliberation, it is concluded that it is more likely
> than not that version of events related by [the resident] did, in
> fact, occur. This is a very close question. The possibility that the
> incident was fabricated by Ms. Kirkham, and placed in the mind
> of [the resident], has been considered and rejected. [The
> resident] has sufficient mental acuity at the time to know what
> had, or had not, happened to her. She was consistent in her

---

[3] Certified nurse assistants do not have licenses; instead, they hold a certification.

[4] According to Mr. Riley's opening statement at the administrative hearing, he is an immigrant from the country of Guana in Africa.

statements over a period of time. The possibility that [the resident] fabricated the incident has likewise been considered. All of the witnesses spoke of her reluctance to make the statements, and her very real fear of [Mr. Riley.] Were she to fabricate something, it might be that animosity, rather than fearfulness, would have been the impression of the listeners. Again, this is a very close question, but it is concluded that, more likely than not, event occurred as related by [the resident].

Mr. Riley retained counsel and appealed the administrative law judge's ruling to the Department. The Department heard no new evidence and considered the appeal only on the record made in the administrative hearing. On January 14, 2010, the Department entered an order affirming the order of the administrative law judge, finding that there was sufficient evidence in the record to support the administrative law judge's decision. Thereafter, Mr. Riley filed a petition for judicial review in the Davidson County Chancery Court. On February 29, 2012, the Chancery Court entered an order concluding that substantial and material evidence supported the determination that Mr. Riley committed an act of abuse against a vulnerable person and that his name should be placed on the abuse registry. Mr. Riley now appeals to this Court.

## II. Analysis

Mr. Riley raises a single issue on appeal: Whether there is substantial and material evidence in the record to support the Department's decision that Mr. Riley abused a vulnerable person so as to place his name on the abuse registry? In Tennessee, those who are found to have abused a vulnerable person must have their name included on a State abuse registry:

> Any state government agency that finds that an individual has committed abuse, neglect, or misappropriation or exploitation of the property of a vulnerable person shall notify the department of health concerning such individual in accordance with subdivision (a)(2). The department of health shall include the name of an individual on the registry when it receives notification from an agency of Tennessee state government that the individual has been found by that agency, pursuant to that agency's procedures and definitions, to have committed abuse, neglect, or misappropriation or exploitation of the property of a vulnerable person.

Tenn. Code Ann. § 68-11-1003(a)(1). Mr. Riley does not dispute the administrative law judge's finding that the resident was a vulnerable person as defined in Tennessee Code Annotated Section 68-11-1002(a)(6) (formerly Tennessee Code Annotated Section 68-11-1004(a)(3)).[5] In addition, Mr. Riley does not dispute that the "unwarranted touching of [the resident's] genital area by a [facility] employee constitutes abuse." Instead, Mr. Riley contends that there is insufficient evidence in the record to support the administrative law judge's finding that he, more likely than not, committed the abuse.

The standard of review in this case is governed by the Uniform Administrative Procedures Act. Specifically, the statute provides, in pertinent part:

> The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

> * * *

---

[5] Tennessee Code Annotated Section 68-11-1002(a)(6) defines a "vulnerable person" as one who is:

> (A) Is under eighteen (18) years of age; or
> (B) Is eighteen (18) years of age or older and, by reason of advanced age or other physical or mental condition, is vulnerable to or has been determined to have suffered from abuse, neglect or misappropriation or exploitation of property and is or has been:

> (i) The subject of any report of harm, abuse, neglect, or exploitation of property made to any state agency or investigative authority with responsibility to investigate those reports pursuant to title 37, chapter 1, parts 1 or 6,title 71, chapter 6, part 1, or pursuant to any other provision of law or regulation;
> (ii) Receiving protective services from a state agency pursuant to law;
> (iii) The victim of any criminal offense that constitutes abuse, neglect, or misappropriation or exploitation of property;
> (iv) In the care of either a state agency, an entity that is licensed or regulated by a state agency, or in the care of an entity providing services under the provisions of a contract between that entity and a state agency; or
> (v) Receiving services in the person's home from any agency licensed or regulated by or contracted to a state agency, including, but not limited to home and community-based services, home health care, or other health care-related services provided through state or federal funds to assist persons to remain in their homes.

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

(i) No agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision.

Tenn. Code Ann. §4-5-322. This Court discussed the standards of review for Tenn. Code Ann. §4-5-322(h)(4) and (5) with specificity in *Jackson Mobilphone Co., Inc. v. Tennessee Pub. Serv. Comm'n*, 876 S.W.2d 106, 110–11 (Tenn. Ct. App. 1993), as follows:

The standards of review in Tenn. Code Ann. § 4-5-322(h)(4) and Tenn. Code Ann. § 4-5-322(h)(5) are narrower than the standard of review normally applicable to other civil cases. They are also related but are not synonymous. Agency decisions not supported by substantial and material evidence are arbitrary and capricious. However, agency decisions with adequate evidentiary support may still be arbitrary and capricious if caused by a clear error in judgment.

A reviewing court should not apply Tenn. Code Ann. § 4-5-322(h)(4)'s "arbitrary and capricious" standard of review mechanically. In its broadest sense, the standard requires the court to determine whether the administrative agency has made a clear error in judgment. An arbitrary decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion.

Likewise, a reviewing court should not apply Tenn. Code Ann. § 4-5-322(h)(5)'s "substantial and material evidence" test mechanically. Instead, the court should review the record carefully to determine whether the administrative agency's decision is supported by "such relevant evidence as a rational

mind might accept to support a rational conclusion." The court need not reweigh the evidence, and the agency's decision need not be supported by a preponderance of the evidence. The evidence will be sufficient if it furnishes a reasonably sound factual basis for the decision being reviewed.

*Jackson Mobilphone*, 876 S.W.2d at 110–11 (citations omitted). Thus, under Tennessee Code Annotated Section 4-5-322, courts are allowed to reverse or modify an agency's decision if the findings, inferences, conclusions or decisions are unsupported by evidence that is both substantial and material in light of the entire record. *Metropolitan Gov 't of Nashville v. Tennessee Dept. of Educ.*, 111 S.W.2d 427 (Tenn. Ct. App. 1989). Substantial and material evidence is "something less than a preponderance of the evidence, but more than a scintilla or glimmer." *Wayne Cnty v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988). In this case, the initial decision was made by the administrative law judge, who made detailed findings of fact and conclusions of law. The Department affirmed the decision of the administrative law judge, finding sufficient evidence in the record to support the administrative law judge's decision. The Chancery Court also affirmed. The question in this case is whether there is sufficient evidence to support the administrative law judge's, and thus the Department's, finding that Mr. Riley committed one or more acts of abuse against a vulnerable person.

In his brief, Mr. Riley first states that "the only evidence in the record as to the alleged abuse is the hearsay statements of [the resident] provided by other witnesses." Mr. Riley does not raise as an issue in his brief the trial court's decision to admit and consider this testimony. Only in a footnote does Mr. Riley argue that these statements were inadmissible. However, Mr. Riley did not object to the admission of this testimony at the administrative hearing. It is well-settled that "[o]ne appearing before an administrative tribunal must make timely objections to procedural errors and must raise errors at the administrative level in order to preserve them for consideration in a petition for judicial review." *McClellan v. Bd. of Regents of State University*, 921 S.W.2d 684, 690 (Tenn. 1996) (citation omitted). Indeed, the rules of this Court provide that the Court of Appeals is not required to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). We recognize that Mr. Riley chose to represent himself at the administrative hearing, and may not have been fluent in the rules of the court. However, this Court has previously held that "[p]ro se litigants must comply with the same substantive and procedural law to which represented parties must adhere." *Chiozza v. Chiozza*, 315 S.W.3d 482, 487 (Tenn. Ct. App. 2009). Accordingly, Mr. Riley cannot now assert that the consideration of this testimony was erroneous. *See Welch v. Bd. of Prof. Resp.*, 193 S.W.3d 457, 464 (Tenn. 2006) ("Generally, failure to make a timely, specific objection in the trial court prevents a litigant from

challenging the introduction of inadmissible evidence for the first time on appeal."). Because there was no objection to the admission of the testimony from the witnesses regarding the resident's statements to them, the administrative law judge was entitled to consider and rely on the testimony in his decision.

Mr. Riley next makes several arguments that question the sufficiency of the evidence submitted. Specifically, Mr. Riley argues that the only information the resident "independently provided as to the identity of the alleged assailant was that he was a black man." In addition, Mr. Riley argues that the resident "at no time provided information as to the date or time of the assault." Finally, Mr. Riley points to conflicting evidence over the staffing patterns at the facility, arguing that some evidence in the record showed that Mr. Riley may not have been the only African-American male nurse assistant taking care of the resident. We agree that, in determining the substantiality of evidence, this Court must take into account whatever in the record fairly detracts from its weight; however, we must not substitute our judgment for that of the agency as to the weight of the evidence on questions of fact. Tenn. Code Ann. § 4-5-322 (5)(b); *City of Memphis v. Civil Serv. Comm'n of City of Memphis*, 216 S.W.3d at 316; *see also Gluck*, 15 S.W.3d at 490. In addition, this Court must keep in mind the over-arching question in this case: whether there is substantial and material evidence to support the administrative law judge's decision. See *Jackson Mobilphone*, 876 S.W.2d at 110–11. From the totality of the evidence in the administrative record, we conclude that there is.

First, the record shows that, when questioned by Ms. Kirkham as to whether the perpetrator was Mr. Riley, the resident responded unequivocally that it was Mr. Riley. Although the resident's mental evaluation showed that her short term memory was weak, testimony from other facility personnel showed that the resident was aware of her surroundings at this time and was able to accurately recall events that had happened. In addition, testimony showed that the resident maintained essentially the same story throughout the investigation. From our review of this evidence, while the resident's statement that Mr. Riley was the perpetrator was certainly prompted by Ms. Kirkham's questioning, we cannot conclude that this statement does not rise to more than a "glimmer" of evidence as required under our limited standard of review. *Wayne Cnty*, 756 S.W.2d at 280. In addition, the resident signed, after being read, a statement which specifically named Mr. Riley as the perpetrator of the abuse. Therefore, regardless of whether the resident provided information of the exact date and time of the incident, she unequivocally named Mr. Riley as the perpetrator.

Further, even though the resident never gave a specific time and date for the abuse, she stated that the abuse had occurred more than once and she stated that the abuse had occurred at night. Moreover, the resident expressed fear of being left alone at night to both

facility personnel and her family. The evidence in the record showed that Mr. Riley was the African-American male nurse assistant most likely to be on the resident's floor at night. Indeed, the evidence showed that Mr. Riley often worked seven nights a week. There was evidence that another African-American male nurse assistant could have been working on the resident's floor around the time the abuse occurred; however, other evidence showed that he may only have begun working on the resident's floor after the resident informed Ms. Kirkham of the incident. As previously stated, this Court is not permitted to re-weigh the evidence. Instead, an administrative law judge's decision "can be supported by substantial and material evidence even if the evidence could support another conclusion." **Hughes v. State Bd. Of Equalization**, 812 S.W.2d 583, 585 (Tenn. Ct. App. 1990). "Courts may reject an administrative agency's factual findings only if a reasonable person would necessarily draw a different conclusion from the record." **Martin v. Sizemore**, S.W.3d 249, 276 (Tenn. Ct. App. 2001) (citing **Jones v. Green**, 946 S.W.2d 817, 828 (Tenn. Ct. App. 1996)). Although we recognize that this evidence could have led the administrative law judge to a different conclusion, that fact is not dispositive. From the totality of the circumstances, we conclude that the administrative law judge, and thus the Department, had substantial and material evidence before them to conclude that Mr. Riley, more likely than not, committed one or more acts of abuse on the resident.

Mr. Riley argues, however, that Ms. Kirkham had animosity against him due to his African heritage, and that she and others have attempted to have Mr. Riley's employment terminated. We agree that the evidence showed that Ms. Kirkham had considerable animosity toward Mr. Riley and that her alleged sexual harassment allegations against Mr. Riley were apparently never reported to the appropriate facility personnel. In addition, the evidence showed that Ms. Kirkham previously made false statements to the facility where she claimed to have worked on a day when she did not. However, the administrative law judge considered and dismissed these allegations, finding that the possibility that "the incident was fabricated by Ms. Kirkham, and placed in the mind of the [the resident], has been considered and rejected," noting the testimony from facility personnel regarding the static nature of the resident's story and the tone of fearfulness the resident continually expressed. Additionally, staff members other than Ms. Kirkham also heard the resident's allegations, testified to essentially the same story as that related by Ms. Kirkham, and stated that they believed the resident's recollection of events was true. Indeed, the administrative law judge stated that at least one staff member who recounted the resident's story, Nurse McGuire, was "a very good, and believable witness." As this Court has explained:

> The administrative judge, as the trier of fact, had the opportunity to observe the manner and demeanor of all of the witnesses as they testified from the witness stand. The weight, faith and credit to be given to any witness' testimony lies in the first

instance with the trier of fact and the credibility accorded will be
given great weight by the appellate court.

***Donihe v. Tenn. Dep't of Safety***, 865 S.W.2d 903, 905 (Tenn. Ct. App. 1993) (citing ***Town of Alamo v. Forcum–James Co.***, 205 Tenn. 478, 327 S.W.2d 47 (Tenn. 1959); ***Sisk v. Valley Forge Ins. Co.***, 640 S.W.2d 844 (Tenn. Ct. App. 1982)). After considering the totality of the evidence, including all evidence that fairly detracts from the administrative law judge's conclusion, we must conclude that substantial and material evidence in the record supports the administrative law judge's, and thus the Department's, conclusion that Mr. Riley, more likely than not, was the perpetrator of an act of abuse on the resident.

### III. Conclusion

The judgment of the Chancery Court of Davidson County is affirmed. The costs of this appeal are taxed to the Appellant Daniel A. Riley, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE